STATE OF NORTH CAROLINA EX REL. COMMISSIONER OF INSUR-
ANCE v. NORTH CAROLINA AUTOMOBILE RATE ADMINISTRATIVE
OFFICE, NATIONWIDE MUTUAL INSURANCE COMPANY, STATE
FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, ALLSTATE
INSURANCE COMPANY, THE AETNA CASUALTY AND SURETY COM-
PANY, THE TRAVELERS INDEMNITY COMPANY, HARTFORD ACCI-
DENT AND INDEMNITY COMPANY, GREAT AMERICAN INSURANCE
COMPANY, UNITED STATES FIDELITY AND GUARANTY COMPANY,
LUMBERMEN'S MUTUAL CASUALTY COMPANY, LIBERTY MUTUAL
INSURANCE COMPANY, IOWA NATIONAL MUTUAL INSURANCE COM-
PANY, ST. PAUL FIRE AND MARINE INSURANCE COMPANY,
UNIGARD MUTUAL INSURANCE COMPANY, MARYLAND CASUALTY
COMPANY, THE SHELBY MUTUAL INSURANCE COMPANY,
AMERICAN MOTORISTS INSURANCE COMPANY, AMERICAN MUTUAL
LIABILITY INSURANCE COMPANY, MIDWEST MUTUAL INSURANCE
COMPANY, UNIVERSAL UNDERWRITERS INSURANCE COMPANY AND
BALBOA INSURANCE COMPANY IN THE MATTER OF RATES AND RATING
CLASSIFICATIONS FOR MOTORCYCLE INSURANCE; ORDER OF THE COMMISSIONER
ENTERED AUGUST 22, 1975

No. 88

(Filed 24 January 1978)

1. **Insurance § 79.3— motor vehicle insurance—classifications required by statute—applicability to motorcycles**

 The General Assembly did not by the enactment of G.S. 58-30.3 and 58-30.4 in 1975 intend to remove motorcycles from the primary use classification and safe driver subclassification plans applicable to motor vehicles generally, and the Commissioner of Insurance exceeded his authority when he refused to apply the classifications provided for in G.S. 58-30.4 to motorcycle liability insurance and established only two premium rates for such insurance based solely on the size of the engine of the insured motorcycle.

2. **Statutes § 5— parts of same statute construed as whole**

 Parts of the same statute dealing with the same subject matter must be considered and interpreted as a whole.

3. **Statutes § 5— effect of administrative construction**

 The construction of statutes adopted by those who execute and administer them is evidence of what they mean.

4. **Statutes § 11— repeal by implication**

 Repeals by implication are not favored, and statutes dealing with the same subject matter will be reconciled and effect will be given to all unless some are irreconcilable with others.

5. **Statutes § 5— construction—avoidance of absurd consequences**

 In construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the

legislature acted in accordance with reason and common sense and did not intend untoward results.

**6. Insurance § 79.3— motorcycle insurance—rate classification plan—erroneous order—proceeding superseded—no remand**

An order in which the Commissioner of Insurance exceeded his authority by refusing to apply to motorcycle liability insurance the classifications required by a statute enacted in 1975, former G.S. 58-30.4, will simply be vacated without remanding the proceeding to the Commissioner for further action where the proceeding has in effect been superseded by a new proceeding and new rates under statutes enacted in 1977, notwithstanding classifications based on age and sex may have been in effect between 1 September 1975 and 1 September 1977 contrary to the provisions of G.S. 58-30.3, since the Commissioner may not now enter a retroactive order complying with the applicable statutes.

APPEAL by Commissioner of Insurance from a decision of a divided panel of the Court of Appeals, reported at 30 N.C. App. 477, 227 S.E. 2d 621 (1976), reversing an order entered by the Commissioner and remanding the matter for further proceedings. Argued as No. 147, Fall Term 1976.

*Rufus L. Edmisten, Attorney General, by Isham B. Hudson, Jr., Hunter & Wharton by John V. Hunter III, Attorneys for Appellant.*

*Allen, Steed and Allen, P.A., by Arch T. Allen, Thomas W. Steed, Jr., and Arch T. Allen III; Bailey, Dixon, Wooten, McDonald and Fountain, by Wright T. Dixon, Jr.; Broughton, Broughton, McConnell & Boxley, P.A., by J. Melville Broughton, Jr.; Young, Moore, Henderson & Alvis, by Charles H. Young; Manning, Fulton & Skinner, by Howard E. Manning, Attorneys for Appellees.*

EXUM, Justice.

The most important question raised, and one which is determinative of the appeal, is whether the Commissioner exceeded his statutory authority by abolishing the primary use classifications and safe driver subclassifications for motorcycle liability insurance. The Court of Appeals concluded that he did, and we agree. We therefore vacate the order entered by him.

A full factual statement outlining the proceedings leading to the Commissioner's order is set out accurately in the opinion of the Court of Appeals. We will not repeat it here. Briefly these

proceedings were precipitated by the enactment on 18 June 1975 of Chapter 666, 1975 Session Laws, hereinafter referred to as House Bill 28.[1] On 20 June 1975 the Commissioner issued his notice to the North Carolina Automobile Rate Administrative Office (hereinafter "Rate Office") that he would conduct public hearings to "rehear and determine a filing of the North Carolina Rate Administrative Office dated May 7, 1970, for a 'Revised Classification and Rating Procedure—Motorcycles' . . . abolish age discrimination in motorcycle insurance classifications pursuant to . . . House Bill 28 . . . review the present weight classification system for motorcycle liability insurance . . . determine whether the rates in general for motorcycle liability insurance are excessive or otherwise not in compliance with law; and to issue such corrective orders as are necessary." Hearings were conducted before the Commissioner on 11 July 1975 when two witnesses were presented by the Insurance Department's staff. After their testimony the Commissioner recessed the hearings until 24 July 1975. Meanwhile on 15 July 1975 the Rate Office filed on behalf of all of its member companies its revised classification and subclassification plan for motorcycle liability insurance which was also designed to comply with the mandates of House Bill 28. Hearings were then held on 24 July 1975, at which time the Rate Office presented its testimony which tended to explain its filing. On 4 August 1975 the hearings continued. Mr. Paul L. Mize, general manager of the Rate Office, explained an amendment to the Rate Office filing, and the principal witness for the Insurance Depart-

---

1. Codified as G.S. 58-30.3 and 58-30.4, the act provides:

"§ 58-30.3. *Discriminatory practices prohibited.* — No insurer shall after September 1, 1975, base any standard or rating plan for private passenger automobiles or motorcycles, in whole or in part, directly or indirectly, upon the age or sex of the persons insured.

"§ 58-30.4. *Revised classifications and rates.* — The North Carolina Automobile Rate Administrative Office shall file with the Commissioner of Insurance for his approval or other action as provided in G.S. 58-248.1 a revised basic classification plan and a revised subclassification plan for coverages on private passenger (nonfleet) automobiles in this State affected by the provisions of G.S. 58-30.3. Said revised basic classification plan will provide for the following four basic classifications, to wit: (i) Pleasure use only; (ii) Pleasure use except for driving to and from work; (iii) Business use; and (iv) Farm use. The North Carolina Automobile Rate Administrative Office shall file with the Commissioner of Insurance for his approval or other action as provided in G.S. 58-248.1 a revised subclassification plan with premium surcharges for insureds having less than two years' driving experience as licensed drivers, or having a driving record consisting of a record of a chargeable accident or accidents, or having a driving record consisting of a conviction or convictions for a moving traffic violation or violations, or any combination thereof. Said subclassification plan shall be designed to provide not less than one-fourth of the total premium income of insurers in writing and servicing the aforesaid coverages in this State.

"The revised basic classification and subclassification plans specified in this section shall supersede the existing basic classification and subclassification plans on the hereinabove specified coverages.

"The Commissioner is authorized and directed to implement the plans provided for in this section on September 2, 1975."

Comr. of Insurance v. Automobile Rate Office

ment's staff, Mr. Robert Holcombe, explained the staff's proposals for revising motorcycle liability rates.

The Rate Office contended that while House Bill 28 mandated the elimination of any classifications on the basis of age or sex, it did not abolish and, rather, required that motorcycles be classified according to uses and their operators be subclassified the same as automobiles and automobile operators pursuant to the provisions of General Statute 58-30.4.[2] The Rate Office also proposed that motorcycles with an engine size of 324 cubic centimeters or less be rated at 50 percent of the applicable private passenger car rate and motorcycles with an engine size of 325 cubic centimeters or more be rated at the applicable private passenger automobile rate.[3]

The Department Staff, on the other hand, took the position that House Bill 28 actually abolished the primary use classification and safe driver subclassification plan for motorcycles. It proposed, consequently, only two premiums for motorcycle liability insurance: one premium for motorcycles with an engine size of not more than 324 cubic centimeters and another for motorcycles with an engine size in excess of 324 cubic centimeters. The Department Staff also offered evidence tending to show that the premiums proposed by the Rate Office for motorcycle liability insurance and the premiums which had been charged in the past for such insurance resulted in grossly low loss ratios for the companies writing this business.[4]

2. For a complete description of this classification and subclassification scheme, see Commissioner of Insurance v. Automobile Rate Office, 293 N.C. 365, --- S.E. 2d --- (1977).

3. This has been the traditional approach for motorcycle liability insurance ratings. For many years motorcycles and their operators have been classified and subclassified in the same manner as automobiles and their operators. Motorcycles having a gross unladen weight of 300 pounds or less traditionally have been rated at 50 percent of the private passenger automobile rate, and those having a gross unladen weight of more than 300 pounds have been rated at the full applicable private passenger automobile rate. See Commissioner of Insurance v. Automobile Rate Office, 24 N.C. App. 223, 210 S.E. 2d 441 (1974), cert. denied, 286 N.C. 412, 211 S.E. 2d 801 (1975).

4. The loss ratio represents incurred losses on claims filed divided by the earned premiums on insurance written for the same period. The Department Staff's evidence tended to show, for example, that the loss ratio in 1972 for bodily injury liability coverage on small motorcycles was .238 and, for large motorcycles, was .287. This means, in effect, that 23.8 percent and 28.7 percent, respectively, of earned premiums were used to pay claims losses and loss adjustment expenses. The Department Staff's evidence tended further to show that normally for motor vehicle liability insurance it would be expected that something in the neighborhood of 60 percent of earned premiums would be used to pay losses and loss adjustment expenses, for a loss ratio of .60, the rest of the premium dollar being used for sales expenses, general administration, and other miscellaneous types of expenses. Thus, while the Rate Office proposed a minimum limits liability premium at the lowest possible rate of $33 for small motorcycles and $65 for large motorcycles, the Insurance Commissioner in his order, based on evidence developed by his staff, promulgated minimum limits premiums for small motorcycles of $17 and, for large motorcycles, $38.

[1] The Commissioner in his final order concluded in part that, "Motorcycle insurance is not subject to that part of Chapter 666 of the 1975 Session Laws . . . identified as G.S. 58-30.4." In the decretal portions of his order he in effect abolished all primary classifications on the basis of use and all safe driver type subclassifications, both prescribed in G.S. 58-30.4, and established only two premiums for basic limits motorcycle liability insurance: one premium for small motorcycles and another for large motorcycles.

Thus the principal and dispositive legal question on this appeal is whether, indeed, House Bill 28 authorized this action on the part of the Commissioner. Applying well-established canons of statutory construction, we think it clear that it did not. As we said in *Commissioner of Insurance v. Automobile Rate Office*, 293 N.C. 365, 392, 239 S.E. 2d 48, 65 (1977):

"The primary function of a court in construing legislation is to insure that the purpose of the legislature in enacting it, sometimes referred to as legislative intent, is accomplished. *In re Filing by Fire Insurance Rating Bureau, supra,* 275 N.C. 15, 34, 165 S.E. 2d 207, 220 (1969). The best indicia of that legislative purpose are 'the language of the statute, the spirit of the act, and what the act seeks to accomplish.' *Stevenson v. City of Durham,* 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972). A court may also consider 'the circumstances surrounding [the statute's] adoption which throw light upon the evil sought to be remedied.' *Milk Commission v. Food Stores,* 270 N.C. 323, 332, 154 S.E. 2d 548, 555 (1967)."

The primary purpose of House Bill 28 was obviously to abolish age and sex as criteria for classifying motor vehicle—both automobile and motorcycle—insurance.

The Commissioner's position that the legislature by enacting House Bill 28 also intended to abolish all primary classification and subclassification plans with regard to motorcycle liability insurance is based on his assertion that when House Bill 28 was initially introduced the word "motorcycles" appeared in that portion of the bill codified as G.S. 58-30.4. When the bill was

ultimately enacted, however, the word "motorcycles" was deleted from that portion of the bill.[5]

There were essentially three substantive changes made in that part of House Bill 28 codified as G.S. 58-30.4 before it was ratified.[6] This first was to give to the Rate Office rather than the Commissioner the responsibility of initiating and filing with the Commissioner a revised classification plan which would eliminate age and sex as classification criteria. The second was to establish specified basic classifications and subclassifications which would supersede the old basic classification and subclassification plans. The third was to change the fraction of total premiums to be derived from subclassification surcharges from not less than one-third to not less than one-fourth. In making this last change House Bill 28 as finally enacted provided, "Said subclassification plan shall be designed to provide not less than *one-fourth* of the total premium income of insurers in writing and servicing *the aforesaid coverages* in this state." (Emphases supplied.) The provision in the bill as originally introduced comparable to this sentence read, "to the end that surcharges assessed against insured operators having bad driving records will provide not less than *one-third* of the total amount of the premium income needed by insurers in writing and servicing coverages on private passenger automobiles *and motorcycles* in this state." (Emphases supplied.)

We are satisfied that the purpose of the legislature in amending this clause in House Bill 28 was to change the fraction of total premiums produced by the subclassification surcharges and not to change the coverages to which the surcharges applied. We see no substantive difference in the use of the words "in writing and servicing coverages on private passenger automobiles and motor-

---

5. The part of House Bill 28 codified as G.S. 58-30.3 was ultimately enacted precisely as it was introduced on 22 January 1975. That part of the bill, however, denominated G.S. 58-30.4 as originally introduced provided in pertinent part: *"Revised classifications and rates.* — The Commissioner of Insurance shall establish classification rate differentials based on Department of Motor Vehicles' driving records for convictions and accidents resulting from violations of insured operators, to the end that surcharges assessed against insured operators having bad driving records will provide not less than *one-third* of the total amount of the premium income needed by insurers in writing and servicing coverages on private passenger automobiles *and motorcycles* in this state.

The Commissioner is authorized and directed to implement the plan provided for in this section on September 2, 1975, and to abolish all other classification plans in respect to these vehicles." (Emphases supplied.)

6. Compare notes 5 and 1, *supra.*

cycles in this state" and the words "in writing and servicing the aforesaid coverages in this state." The reference to "coverages on private passenger automobiles and motorcycles" in G.S. 58-30.4 as originally introduced obviously echos the reference to "private passenger automobiles or motorcycles" in G.S. 58-30.3 as originally introduced. Likewise it seems abundantly clear that the words "the aforesaid coverages" in the amendment refers to the first use of the word "coverages" in G.S. 58-30.4 as ratified, where the section speaks of "coverages on private passenger (nonfleet) automobiles . . . *affected by the provisions of G.S. 58-30.3.*" (Emphasis supplied.) The provisions of G.S. 58-30.3 expressly refer to both automobiles and motorcycles.

[2] Parts of the same statute dealing with the same subject matter must be considered and interpreted as a whole. *Fishing Pier v. Town of Carolina Beach*, 274 N.C. 362, 163 S.E. 2d 363 (1968); *In re Hickerson*, 235 N.C. 716, 71 S.E. 2d 129 (1952). Considering the legislation contextually and as a whole, we are satisfied that the purpose of the General Assembly in inserting the word "motorcycles" in G.S. 58-30.3 was to insure that age and sex would be eliminated as classification criteria in both automobile and motorcycle insurance. There was no need, thereafter, to continue to refer to automobiles *and* motorcycles each time coverages "affected by the provisions of G.S. 58-30.3" were mentioned.

We are fortified in this opinion by these further considerations:

In *Commissioner of Insurance v. Automobile Rate Office*, 24 N.C. App. 223, 210 S.E. 2d 441 (1974), *cert. denied*, 286 N.C. 412, 211 S.E. 2d 801 (1975), the Court of Appeals had occasion to review an order of the Commissioner in which he then, before the enactment of House Bill 28, attempted to abolish all classification and subclassification plans for motorcycle liability insurance rates. In holding that he thus exceeded his statutory authority the Court of Appeals said, 24 N.C. App. at 226, 210 S.E. 2d at 443:

"Such authority as the Commissioner has with respect to motorcycle liability insurance rates is contained in Article 25 of G.S. Chap. 58, which also provides for the creation and prescribes the functions of the North Carolina Automobile Rate Administrative Office. The word 'motorcycle' does not appear in Article 25 of G.S. Chap. 58, but the statutes in that

Article use the words 'automobile' and 'motor vehicles which are private passenger vehicles' and 'private passenger vehicles' interchangeably, and although none of these terms are further defined in G.S. Chap. 58, we hold that 'automobile' liability insurance includes 'motorcycle' liability insurance and that the same laws apply to both."

Since 1964 motorcycles, pursuant to the provisions of Article 25 of Chapter 58 of the General Statutes, have been classified and subclassified precisely like automobiles for insurance rate making purposes. *See Commissioner of Insurance v. Automobile Rate Office, supra.*

[3] The construction of statutes adopted by those who execute and administer them is evidence of what they mean. *McPherson v. City of Asheville,* 283 N.C. 299, 196 S.E. 2d 200, 61 A.L.R. 3d 1119 (1973). Thus before the enactment of House Bill 28 those charged with the administration of Article 25 of Chapter 58, dealing with motor vehicle insurance, had interpreted these provisions to include motorcycles. The Court of Appeals has expressly so interpreted these provisions. The Commissioner, nevertheless, argues that House Bill 28 repealed these provisions insofar as they required motorcycles to be classified and subclassified for insurance rate making purposes like other motor vehicles. House Bill 28, however, does not expressly remove motorcycles from the general classification scheme. The Commissioner's argument is that it does so by implication.

[4] Repeals by implication are not favored, *D&W, Inc., v. Charlotte,* 268 N.C. 577, 151 S.E. 2d 241, supp. op. 268 N.C. 720, 152 S.E. 2d 199 (1966), and statutes dealing with the same subject matter will be reconciled and effect given to all unless some are irreconcilable with others. *Person v. Garrett, Comr. of Motor Vehicles,* 280 N.C. 163, 184 S.E. 2d 873 (1971). We are satisfied that, had the legislature desired to treat motorcycles differently from other types of motor vehicles for insurance rate making purposes, it would have done so explicitly and unambiguously, and not by implication as the Commissioner suggests.

On the face of it, moreover, it is difficult to perceive why motorcycles and their operators should not be subject to the same classifications for insurance rate making purposes as automobiles and their operators. Certainly motorcycles, like automobiles, are

subject to being used purely for pleasure, for driving to and from work, and for business. The Insurance Department staff's own witness in these proceedings, qualified by the Commissioner as an expert in the marketing of motorcycles in North Carolina, testified that motorcycles were variously used "for around town transportation, back and forth to school, back and forth to work, a day to day transportation type of vehicle" and as purely pleasure vehicles. He also testified that "the experience factor seems to be most dominant in motorcycle accidents" and more important "than the type of motorcycle being operated or the size of the motorcycle being operated." He said further, "I think the driving record and attitude of the operator are the key factors" and that the "driving record of the operator" is a "proper method" for rate classifications. He said "inexperienced operators are more prone to having accidents than experienced operators."

[5] In construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results. *State v. Spencer*, 276 N.C. 535, 173 S.E. 2d 765 (1970); *King v. Baldwin*, 276 N.C. 316, 172 S.E. 2d 12 (1970). That the interpretation urged upon us by the Commissioner would produce, on this record, a somewhat bizarre result, is an additional reason for our refusing to adopt it.

Finally, we note that the 1977 General Assembly enacted new and comprehensive legislation for the purpose of regulating motor vehicle and other types of insurance rate making. Article 25 of Chapter 58 dealing with motor vehicle insurance was expressly repealed. *See Commissioner of Insurance v. Automobile Rate Office*, 293 N.C. 365, 239 S.E. 2d 48 (1977). The legislation was enacted as Chapter 828 of the 1977 Session Laws and is codified in Chapter 58 in the 1977 Cumulative Supplement to Volume 2B of the General Statutes. In the definitional section of the new legislation, G.S. 58-131.35, a "private passenger motor vehicle" is defined to mean, in part, "a motorcycle, motorized scooter or other similar motorized vehicle not used for commercial purposes."[7] Chapter 828 of the 1977 Session Laws re-enacted

---

7. Other definitions of "private passenger motor vehicle" contained in this subsection are:

"a. A motor vehicle of the private passenger or station wagon type that is owned or hired under a long-term contract by the policy named insured and that is neither used as a public or livery conveyance for passengers nor rented to others without a driver; or

General Statute 58-30.3, but it substantially amended General Statute 58-30.4.[8] As amended General Statute 58-30.4 refers to revised basic and subclassification plans for coverages on "private passenger (nonfleet) motor vehicles in this state." Because of the definition of a "private passenger motor vehicle" in General Statute 58-131.35(8), it is clear beyond question that the legislature intended to classify and subclassify motorcycles in the same manner as automobiles for insurance rate making purposes.

Indeed, pursuant to Chapter 828 of the 1977 Session Laws the newly created North Carolina Rate Bureau filed on 1 September 1977 a new classification and subclassification plan for automobiles and motorcycles for the Commissioner's approval. *See Commissioner of Insurance v. Automobile Rate Office*, 293 N.C. 365, 239 S.E. 2d 48 (1977). The plan proposes that motorcycles with an engine size of 324 cubic centimeters or less be rated at 50 percent of the applicable automobile rate and those with an engine size of 325 cubic centimeters or more be rated at the applicable automobile rate. After hearings this plan was approved by the Commissioner by order dated 10 November 1977.

[1] In view, therefore, of the subsequent legislation enacted only two years after the legislation here in question, we think it manifest that the General Assembly did not by the enactment of House Bill 28 in 1975 intend to remove motorcycles from the primary and subclassification plans applicable to motor vehicles generally.

---

"b. A motor vehicle with a pick-up body, a delivery sedan or a panel truck that is owned by an individual or by husband and wife or individuals who are residents of the same household and that is not customarily used in the occupation, profession, or business of the insured other than farming or ranching. Such vehicles owned by a family farm copartnership or corporation shall be considered owned by an individual for purposes of this Article."

8. The new version of this statute, with amendments emphasized, reads:

"The North Carolina *Rate Bureau shall promulgate* a revised basic classification plan and a revised subclassification plan for coverages on private passenger (nonfleet) *motor vehicles* in this State affected by the provisions of G.S. 58-30.3. Said revised basic classification plan will provide for the following four basic classifications to wit: (i) Pleasure use only; (ii) pleasure use except for driving to and from work; (iii) business use; and (iv) farm use. The North Carolina *Rate Bureau shall promulgate* a revised subclassification plan *which approximately reflects the statistical driving experience and exposure of insureds in each of the four basic classifications provided for above, except that no subclassification shall be promulgated based, in whole or in part, directly or indirectly, upon the age or sex of the person insured. Such revised subclassification plan may provide for* premium surcharges for insureds having less than two years' driving experience as licensed drivers, *and shall provide for premium surcharges for drivers* having a driving record consisting of a record of a chargeable accident or accidents, or having a driving record consisting of a conviction or convictions for a moving traffic violation or violations, or any combination thereof, *and the premium income from insureds subject to this premium surcharge* shall provide not less than one-fourth of the total premium income of insurers in writing and servicing the aforesaid coverages in this State. *The classification plans and subclassification plans so promulgated by the Bureau shall be subject to the filing, hearing, disapproval, review and appeal procedures before the Commissioner and the courts as provided for rates and classification plans in G.S. 58-128, G.S. 58-129, and G.S. 58-130.*"

[6] The Commissioner then exceeded his authority under House Bill 28 when he refused to apply the classifications provided for in G.S. 58-30.4 to motorcycles. This kind of error would normally result in our vacating his order and remanding the case to him for further proceedings. This proceeding, however, has in effect been superseded by new proceedings and new rates under new statutes. Thus it would be futile to remand this case. We therefore simply vacate the order of the commissioner, as we did in *Commissioner of Insurance v. Automobile Rate Office, supra,* (hereinafter No. 89).

We note that the Commissioner in a petition to rehear No. 89 urges that we should have remanded it to him for further proceedings. His argument is that by simply vacating his order we have, in effect, nullified the provisions of General Statute 58-30.3 which flatly prohibit the use of motor vehicle insurance classifications based on age and sex after 1 September 1975. Assuming, as the Commissioner argues, that such classifications have been in effect until at least 1 September 1977, the date of the new proceedings already alluded to, we nevertheless must reject this argument.

It is true that General Statute 58-30.3 as re-enacted in 1977 continues to prohibit age and sex as criteria for motor vehicle insurance rate making classifications "after September 1, 1975." Nothing we said in No. 89 indicates to the contrary. But House Bill 28, by which this section was originally enacted, did more. It prescribed (and present General Statute 58-30.4 continues to prescribe) the procedure for abolishing these criteria. The procedure originally contained in House Bill 28 provided for the filing with the Commissioner "for his approval or other action as provided in G.S. 58-248.1" a revised classification plan as thereafter described in the statute. Thus House Bill 28 mandated (and present General Statute 58-30.4 continues to mandate)[9] that both the Rate Office and the Commissioner take such steps as would culminate in the promulgation of not just any plan abolishing age and sex classification criteria but of a plan which complied with the revised classifications as set out in the statute. The Commis-

---

9. Present G.S. 58-30.4 provides in part: "The classification plans and subclassification plans so promulgated by the Bureau shall be subject to the filing, hearing, disapproval, review and appeal procedures before the Commissioner and the courts as provided for rates and classification plans in G.S. 58-128, 58-129, and 58-130."

sioner both in this case and in No. 89 failed to promulgate a plan which complied with these revised classifications.

Because of the new rates which have gone into effect pursuant to new statutes and a new order of the Commissioner, a remand in this case, as in No. 89, would be futile. The reason is that rates are made prospectively, not retroactively. The Commissioner could not now enter an order which might comply with applicable statutes and make the order retroactive to September, 1975. To effect such a rate change retroactively would be an expensive and impractical, if not an impossible, task for insurers. "It is not only impractical to fix premium rates retroactively, it is expressly required by G.S. 58-131.2 that premium rates fixed in accordance with the statutory plan be applied only to policies issued after the rates are so established. Consequently, the entire procedure contemplates a looking to the future." *In re Filing by Fire Insurance Rating Bureau*, 275 N.C. 15, 32, 165 S.E. 2d 207, 219 (1969). General Statute 58-131.2, a provision in former Article 13 of Chapter 58 dealing with fire and casualty insurance before it was repealed by Chapter 828, 1977 Session Laws, provided in part:

> "Any reduction or increase of rates ordered by the Commissioner shall be applied by the Rating Bureau subject to his approval within 60 days and shall become effective solely to such insurance as is written having an inception date on and after the date of such approval."

Before they were repealed by Chapter 828, 1977 Session Laws, the provisions in Article 25 of Chapter 58 dealing with motor vehicle insurance did not contain the exact counterpart to the quoted portion of General Statute 58-131.2. It is clear, however, from other language in these provisions and in present Chapter 58 that these statutes also contemplate fixing rates which will operate in the future, not retroactively. For example, General Statute 58-131.42, as enacted in Chapter 828, 1977 Session Laws, precludes any order of the Commissioner altering rates from affecting "any contract or policy made or issued prior to the expiration of the period set forth in the order."

The situation this Court faced in *Utilities Commission v. Edmisten*, 291 N.C. 451, 232 S.E. 2d 184 (1977), relied on by the Commissioner in his petition for rehearing Case No. 89, is

distinguishable on its facts and law applicable thereto. We held in that case that the Utilities Commission could not authorize the collection of certain fuel adjustment charges in violation of the clear mandate of General Statute 62-134(e) precluding their collection beyond a certain date. The fuel adjustment charges collected in that case pursuant to the unlawful order of the Utilities Commission had to be refunded. The refund was required because this Court reversed and vacated the order which permitted them.

As we noted in *Comr. of Insurance v. Rating Bureau*, 292 N.C. 471, 481, 234 S.E. 2d 720, 725 (1977), "Chapter 58 of the General Statutes contains no provision . . . comparable to G.S. 62-135 whereby a public utility . . . may put its proposed rate increase into effect by filing a bond to assure refund of the collected increase to the extent that it may ultimately be disallowed." We concluded in that case, 292 N.C. at 482, 234 S.E. 2d at 726, in face of "the silence of Chapter 58" on the subject, that rates placed into effect under the so-called "deemer" provision of then General Statute 58-131.1 were lawful rates and that although the Commissioner in subsequent proceedings might disapprove these rates, "[s]uch disapproval takes effect from the date of the order but is not retroactive and does not render unlawful the collection of premiums made prior thereto so as to require, or authorize the requirement of, a refund thereof."

In the case now before us as well as in No. 89, the Commissioner's orders have been determined to be unlawful. Therefore no collection of insurance premiums could take place under them. The companies have, perforce, continued to collect rates under previous, presumably lawful orders of the Commissioner. They could not be made to alter these rates retroactively by any order the Commissioner might now enter on remand from this Court. Any such order would have to operate *in futuro*.

There is evidence in this case that premiums for motorcycle liability insurance are higher than they should be. The Commissioner has the power under present provisions of Chapter 58, *see* particularly G.S. 58-124.21 and G.S. 58-131.42, upon proper proceedings, to reduce these rates. He may not, however, reduce rates by unlawfully abolishing classifications and subclassifications which are required by statute.

Ports Authority v. Roofing Co.

For the reasons given, the decision of the Court of Appeals vacating the order of the Commissioner is

Affirmed.