IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-338

Filed 16 January 2024

Buncombe County, Nos. 21-CRS-82197-99

STATE OF NORTH CAROLINA

v.

CORY MICAH FORNEY

Appeal by defendant from judgments entered 8 July 2022 by Judge R. Gregory Horne in Buncombe County Superior Court. Heard in the Court of Appeals 14 November 2023.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General J.D. Prather, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Daniel Shatz, for defendant-appellant.*

THOMPSON, Judge.

In this appeal from defendant's conviction on a charge of impaired driving, among other offenses, he argues that the trial court erred in admitting the results of a chemical analysis of defendant's breath. While we agree that the evidence in question should not have been admitted at trial, we conclude that the error was not prejudicial to defendant. Accordingly, defendant's conviction on a charge of impaired driving must be upheld.

## I. Factual Background and Procedural History

The evidence introduced at defendant's trial tended to show the following: On 9 March 2021, Officer Samuel DeGrave, of the Asheville Police Department, was on traffic enforcement duty observing a stop sign located in East Asheville. Just after 10:00 p.m., a red Dodge minivan being operated by defendant[1] failed to stop at the stop sign, and DeGrave initiated a traffic stop. At the beginning of their interaction, DeGrave explained the reason for the traffic stop and defendant informed DeGrave that defendant had no driver's license. DeGrave detected an odor of alcohol emanating from the vehicle and noticed that the odor was stronger when defendant spoke. DeGrave further observed that defendant's speech was slow and slurred and his eyes were red and glassy; DeGrave's suspicion that defendant had consumed alcohol was also raised when he saw defendant put a piece of mint gum into his mouth while DeGrave was verifying defendant's identity and that of the female passenger in the vehicle.

After completing that process, DeGrave returned to the minivan and informed defendant that DeGrave was going to conduct three standardized field sobriety tests, which the officer was certified to perform. He thereafter performed three such tests on defendant. On the horizontal gaze nystagmus (HGN) test—about which DeGrave was allowed to testify as an expert—DeGrave noted six of six possible indications of impairment. DeGrave noted two of eight possible indications of impairment on the

---

[1] The vehicle's occupants also included a female passenger in the passenger seat and a child in the back seat.

walk-and-turn test and three of four indications of impairment on the one-leg-stand test. DeGrave testified that a research study of these results created a 91% likelihood that defendant was appreciably impaired. Based upon his observations and the test results, DeGrave formed the opinion that defendant had consumed a sufficient quantity of alcohol to appreciably impair his faculties and arrested him.

At the Buncombe County Jail, Officer Kenneth Merritt of the Biltmore Forest Police Department, a certified chemical analyst, was called in to perform a breath analysis of defendant using an "EC/IR II Intoximeter." After advising defendant of his implied consent rights, Merritt began a fifteen-minute "observation period" designed to ensure that the individual does not eat food, consume alcohol, regurgitate, or smoke prior to testing, primarily to ensure the presence of no "mouth alcohol" that might affect the accuracy of the blood alcohol reading. Merritt administered a breath test at 12:05 a.m. which resulted in a 0.11 blood alcohol concentration (BAC) reading. When Merritt then noticed that defendant had chewing gum in his mouth, he had defendant spit out the gum and then administered a second breath test at 12:07 a.m., which again resulted in a 0.11 BAC reading.

Defendant was later charged with driving while impaired, driving while impaired with three prior convictions of driving while impaired within 10 years of the date of the offense, driving while license revoked, and failure to stop for a stop sign. The case came on for hearing before Judge Gregory Horne at the 5 July 2022 session of Superior Court, Buncombe County. Defendant filed several pretrial motions,

including a motion in limine which sought to exclude the results of the EC/IR II breath testing on the basis that Merritt failed to follow the required observation protocol before administering the second breath test. That motion was denied following an evidentiary hearing. Defendant then pled guilty to the offenses of driving while impaired with three prior convictions of driving while impaired within 10 years of the date of the offense and driving while license revoked, not guilty to driving while impaired, and not responsible for the stop sign violation.

The other matters proceeded to trial before a jury, and when Merritt was asked to describe the step of the Intoximeter procedure known as the "observation period," he testified that "the observation period is a 15-minute period that I'm looking for regurgitation, or as bad as it sounds, throw up, eating food, consuming alcohol, or smoking cigarettes. *It is mainly to detect for mouth alcohol.*" (Emphasis added.) Merritt also stated that he did not see defendant "put anything in his mouth or . . . see any signs of him regurgitating or drinking or anything like that." Nevertheless, Merritt testified that after he then collected a first breath sample from defendant, Merritt "was notified that [defendant] had gum in his mouth." Merritt had defendant spit out the gum and collected the second breath sample required under the pertinent procedures two minutes later. Defendant renewed his objection to the admission of the Intoximeter results, and the trial court overruled those objections and allowed the results to be published to the jury.

On cross examination, defendant's trial counsel discussed the waiting period with Merritt:

> Q. And the reason that we need an observation period is to make sure that there's nothing going on internally for the subject of the test that could skew the results of the test, correct?
>
> A. For the most part, yes, sir. My understanding is to allow for deterioration of mouth alcohol.

Merritt acknowledged that "the reason for the rules and regulations, again, is to assure us of the accuracy and reliability of the results that the [Intoximeter] provides" and also agreed that "for best practices" he should have restarted the observation period after having defendant spit out the gum. However, Merritt repeatedly stated that he did not believe the rules had been violated because they only explicitly ask the analyst "to look for consuming alcohol, smoking, eating, and regurgitating" and do not address chewing gum.

The State then called Daniel Cutler, an employee of the North Carolina Forensic Tests for Alcohol Branch of the Division of Public Health within DHHS, who was then acting as a Drug and Alcohol Impaired Driving Regional Coordinator supervising the affairs of the Forensic Tests for Alcohol Branch within the western 18 counties of the State, and Cutler was admitted as an expert in the EC/IR II breath testing instrument and its procedures without objection. Cutler testified that "[g]um in the mouth will not, and by all indications, looking at the test record, did not affect the results of the breath sample," citing two published studies. Cutler explained that

one of those studies indicated that chewing "sugar-free gum, which is a salivary flow promoter" for five minutes led to lower BAC results as compared to the control situation in which no gum was chewed. The first study was conducted using "an Intoxilyzer 5000C," the testing instrument used in North Carolina prior to our State's adoption of the Intoximeter Model EC/IR II. The second study cited involved testing with "75 different brands of chewing gum" and indicated that one brand of gum, "Trident Splash Strawberry with Kiwi" caused elevated BAC results, but the remaining varieties of gum did not. The testing instruments used in that study were "the Alco-Sensor IV DWF, and Alcotest 7410 GLC."

Dr. Andy Ewans, a forensic toxicologist, testified for the defense as an expert in toxicology and agreed that "in general" gum in a test subject's mouth would not affect chemical analysis results. He further noted, however, Cutler's own reference to a study indicating an impact on BAC results from at least some types of gum and also emphasized that regardless, "the protocol established by statute was not followed by Sergeant Merritt."

On 8 July 2022, the jury found defendant guilty of the impaired driving charge and responsible for the stop sign violation. Defendant gave notice of appeal in open court.

## II. Analysis

Defendant's sole contention on appeal is that the trial court committed error in denying his motion to exclude the results of the Intoximeter's chemical analysis

and in overruling defendant's objections to the admission of that evidence when it was introduced at trial. Specifically, defendant argues that after having defendant remove the gum from his mouth, Merritt's failure to conduct a new observation period rendered the Intoximeter results inadmissible under the relevant provision of the North Carolina General Statutes and related Department of Health and Human Services rules. We agree. However, because defendant has failed to show "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial," N.C. Gen. Stat. §15A-1443(a) (2021), we hold that he has not demonstrated prejudice.

## A. Error in admission of chemical analysis results

The primary issue before us in this appeal, which appears to be a matter of first impression, is one of statutory and regulatory interpretation. Such questions are reviewed de novo. *Sound Rivers Inc. v. N.C. Dep't of Envtl. Quality*, 271 N.C. App. 674, 727, 845 S.E.2d 802, 834 (2020), *affirmed in part and disc. review allowed in part*, ___ N.C. ___, 891 S.E.2d 83 (2023).

> An appeal de novo is one in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings. Under a de novo review, the court considers the matter anew and freely substitutes its own judgment for that of the trial court.

*In re K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (citations, quotation marks, and brackets omitted).

The provisions at the heart of this appeal concern the admissibility of breath test results obtained by means of chemical analysis. "A chemical analysis of the breath . . . is admissible in any court . . . if it . . . is performed in accordance with the rules of the Department of Health and Human Services." N.C. Gen. Stat. §20-139.1(b)(1) (2021).[2] *See also State v. Davis*, 208 N.C. App. 26, 34, 702 S.E.2d 507, 513 (2010). The pertinent Department of Health and Human Services (DHHS) rules are found in Chapter 10A, Subchapter 41B of the North Carolina Administrative Code, titled "Injury Control." The testing procedure for the type of Intoximeter employed for the chemical analysis of defendant's breath—the EC/IR II—is found in 10A NCAC 41B.0322 and provides that "when administering a test using the Intoximeters," a chemical analyst must, *inter alia*, "[e]nsure [that] observation period requirements have been met" before collecting two breath samples for analysis. 10A NCAC 41B.0322(2), (6), (7); *see also* N.C. Gen. Stat. § 20-139.1(b)(1), (b3). The "observation period," in turn, is defined as

> a period during which a chemical analyst observes the person or persons to be tested to determine *that the person* or persons *has not ingested alcohol or other fluids, regurgitated, vomited, eaten, or smoked in the 15 minutes immediately prior to the collection of a breath specimen.* The chemical analyst may observe while conducting the operational procedures in using a breath testing instrument. *Dental devices or oral jewelry need not be*

---

[2] This statute also requires that "[t]he person performing the analysis ha[ve] . . . a current permit . . . to perform a test of the breath using the type of instrument employed." N.C. Gen. Stat. § 20-139.1(b)(1). Merritt's certification to perform the chemical analysis here is not disputed.

*removed.*

10A NCAC 41B.0101(6) (emphases added). As the proponent of breath test evidence in an impaired driving case, "the State bears the burden of proving compliance with the 'observation period' requirement set out in N.C. Gen. Stat. § 20-139.1." *State v. Roberts*, 237 N.C. App. 551, 560, 767 S.E.2d 543, 550 (2014), *disc. review denied*, 368 N.C. 258, 771 S.E.2d 324 (2015).

The basis of defendant's motion in limine to exclude the chemical analysis results was that, while Merritt conducted an observation period before obtaining the first breath sample from defendant, after determining that defendant had gum in his mouth and having defendant spit out the gum, Merritt did not conduct an additional observation period and then began the testing process again. At the hearing on the motion, the State contended that Merritt did not violate the statutory mandate or the DHHS rules "because chewing gum is not eating," further emphasizing that "it would be different if [defendant] had actually taken the gum and put it in his mouth during the observation period, but there's nothing in this observation period definition that required the officer to actually check the person's mouth." Rather, the State argued that an analyst need only "make sure [test subjects] don't eat, drink, regurgitate, anything like that." Defendant, in contrast, argued that the determination of whether a violation occurred centered on whether "[t]here's a foreign substance in his mouth . . . . We did not have a second observation period after the foreign substance was found. Therefore, we do not have the proper procedure."

In explaining the decision to deny defendant's motion to exclude, the trial court appears to have adopted the State's, rather than defendant's, framing of the question and therefore focused on whether "chewing gum" was an activity covered by the plain language of 10A NCAC 41B.0101(6). In so doing, the trial court found "that there is no evidence that [defendant] ingested alcohol or other fluids, that he regurgitated, vomited or smoked during the 15 minutes. Therefore, the issue is . . . *whether or not chewing gum equates to eating or having eaten* within the 15-minute period." (Emphasis added.) After noting that "eaten" is not defined in the pertinent portion of the Administrative Code, the trial court consulted an online dictionary and found that a definition for "eat" is "to take in through the mouth as food, ingest, chew and swallow in turn."[3] The trial court then held that because "chewing gum does not equal having eaten something[,]" Merritt's failure to conduct a second observation period after having defendant spit out his gum was in "technical compliance with the rules and regulations." While it may be the case that "chewing gum does not equal having eaten something[,]" upon our de novo consideration, we agree with defendant's appellate assertions that "the trial court was wrong in following the State's suggestion that the issue boiled down to "whether or not chewing gum constitutes eating" and that instead, the DHHS rules here must be "interpreted to contain an

---

[3] Consulting a dictionary to determine the plain meaning of a word not defined in a statute is entirely appropriate. *Wing v. Goldman Sachs Trust Co., N.A.*, 382 N.C. 288, 298, 876 S.E.2d 390, 398 (2022).

implicit requirement that foreign objects must generally be removed from the test subject's mouth during the observation period."

As our Supreme Court has recently emphasized:

> "The primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134 (1990). Although the first step in determining legislative intent involves an examination of the "plain words of the statute," *Elec. Supply Co. of Durham v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291 (1991), "[l]egislative intent can be *ascertained not only from the phraseology of the statute but also from* the nature and purpose of the act and *the consequences which would follow its construction one way or the other*," *Sutton v. Aetna Cas. & Sur. Co.*, 325 N.C. 259, 265, 382 S.E.2d 759 (1989) (citations omitted).

*State v. Alexander*, 380 N.C. 572, 587, 869 S.E.2d 215, 227 (2022) (emphases added).

Thus, in attempting to ascertain the legislative intent behind a statute or rule, "strict literalism [should] not be applied to the point of producing 'absurd results.'" *Proposed Assessments of Additional Sales & Use Tax v. Jefferson-Pilot Ins. Co.*, 161 N.C. App. 558, 560, 589 S.E.2d 179, 181 (2003) (quoting *Taylor v. Crisp*, 286 N.C. 488, 496, 212 S.E.2d 381, 386 (1975)). *See also Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 470, (1989) (Kennedy, J., concurring) ("Where the plain language of the statute would lead to patently absurd consequences that [the legislature] could not *possibly* have intended, [courts] need not apply the language in such a fashion.") (citations and internal quotation marks omitted) and *Commissioner of Ins. v. Automobile Rate Office*, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978) (holding that a

reviewing court must avoid reading the plain language of a statute or rule in a manner that leads to absurd or bizarre consequences).

Here, the plain language of the rule defining the observation period—the individual words themselves—may appear to be clear and unambiguous, providing a specific list of actions that an analyst must determine the person to be tested has not engaged in for the fifteen minutes prior to the sample being taken: "ingested alcohol or other fluids, regurgitated, vomited, eaten, or smoked," with "chewed" or "chewed gum" not appearing in the list. 10A NCAC 41B.0106(6). In addition, DHHS elected not to end the list in this rule with a catch-all term such as "or had other substances or foreign objects in the mouth." Nevertheless, the intent of subsection N.C. Gen. Stat. § 20-139.1(b)(1), titled "Approval of Valid Test Methods; Licensing Chemical Analysts," is also plain and unambiguous: to ensure that chemical analysis results are sufficiently valid that they may be admitted "in any court or administrative hearing or proceeding" as evidence of impairment. *See* N.C. Gen. Stat. § 20-139.1(b)(1). In an effort to achieve that end, the legislature has delegated to DHHS—an agency undoubtedly more expert than the General Assembly regarding BAC measurement, chemical analysis, and the procedures appropriate to maximize scientific reliability and validity—the task of rulemaking regarding breath testing via Intoximeters. In turn, DHHS has set forth various relevant definitions in 10A NCAC 41B.0106(6) and a specific procedure for the Intoximeter employed here in 10A NCAC 41B.0322.

In sum, we believe the intent of both the legislature and DHHS in the provisions pertinent here is clear: to ensure that the chemical analysis of a subject's breath is accurate in measuring BAC and not tainted by the presence of substances in the mouth during testing. And in our view, to adopt the State's position that the observation period requirement is not violated when a subject "chews" something during the period would lead to absurd results and have bizarre consequences because it would mean, for example, that a subject could engage in the following activities not listed in 10A NCAC 41B.0106(6) moments before the taking of breath samples: *chewing* gum—presumably including nicotine gum—or tobacco or food that is spit out before swallowing, *dipping* snuff, *sucking* on a medicated throat lozenge or a hard candy, *using* an inhaler, and *swallowing* a pill. Surely if "ingest[ing] . . . other fluids," which would include ordinary tap water, is considered a potential problem in ensuring an admissible chemical analysis of a breath sample, the examples just stated would likewise be problematic. This assumption aligns with the testimony from Merritt, a certified chemical analyst, that the purpose of the observation period "is to allow for deterioration of *mouth* alcohol" before taking breath samples.

We acknowledge the testimony at trial from the State's expert witness Cutler but note that one of the studies he cited used only sugar-free gum and the other did find an increased BAC reading after one type of gum was tested. Here, there was no evidence presented about the specific type or brand of gum in defendant's mouth during the observation period and testing and DeGrave's observation of defendant

putting a piece of "mint gum" in his mouth occurred some two hours before the chemical analysis. Further, while defendant's chemical analysis was conducted using the Intox EC/IR II, the two studies Cutler cited regarding the effect of chewing gum were conducted using other testing instruments, one of which was previously used in North Carolina, but which has since been replaced by the Intoximeter EC/ER II. In any event, the procedures promulgated by DHHS in 10A NCAC 41B.0322 are specified to "be followed when administering a test using the Intoximeters, Model Intox EC/IR II and Model Intox EC/IR II (Enhanced with serial number 10,000 or higher)" and Cutler himself testified that "over the years there have been many different technologies for breath testing," presumably with different procedures for their use.

We also reject the State's contention that chewing gum would actually make the chemical analysis "more accurate," citing Cutler's testimony that chewing gum might reduce the "mouth alcohol effect" by 85%. We disagree that the reduction of the "mouth alcohol effect" would make the test more *accurate*, even if chewing gum could have some effect, potentially beneficial to a test subject, on the chemical analysis results. More importantly, as Cutler testified, the Intoximeter estimates alcohol in the blood (BAC) based on a measurement of alcohol in the breath—a ratio which in reality varies amongst different people—by using a single specific ratio to standardize the testing of all test subjects. Test results for breath samples taken from persons chewing gum, even under Cutler's testimony, would likely *differ* from those where a

test subject did not have foreign substances in his or her mouth during the observation period (and while giving a breath sample). This circumstance undercuts the efforts indicated by the DHHS rules to standardize chemical analysis by Intoximeter and frustrates the intent of the General Assembly to automatically permit the admission of such evidence in any court.

In this appeal, we need only address an asserted violation of the requirements for automatic admissibility of chemical analysis of the breath on the facts before us: that defendant had gum of an unknown sort[4] in his mouth during the observation period and during the taking of the first breath sample. For the reasons discussed above, we hold that the DHHS observation provisions were violated in defendant's case and that Merritt should have conducted a new fifteen-minute observation period after having defendant spit out his gum and before taking breath samples.

## B. Prejudicial impact of error

Having concluded that the trial court erred in allowing the chemical analysis results to be admitted in this case, we must now determine whether this error prejudiced defendant.

A defendant is prejudiced by errors relating to rights

---

[4] At trial, DeGrave testified that he saw defendant "putting mint gum in his mouth" as DeGrave was walking back to defendant's vehicle after returning to his patrol car where he had attempted to check defendant's identification materials and that of the passenger in the car. DeGrave did not testify about whether he was able to assess whether the gum was ordinary chewing gum, nicotine gum, or some other type of gum. In addition, the traffic stop was several hours prior to the chemical analysis, and nothing in the record establishes whether the gum in defendant's mouth during the observation period and the taking of the first breath sample was the same gum which DeGrave witnessed defendant putting into his mouth.

> arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant.

N.C. Gen. Stat. § 15A-1443(a) (2021).

In accordance with N.C. Gen. Stat. § 20-138.1(a)(1) and (2), the jury in this trial was instructed that the State could establish the impairment element of driving while impaired either by establishing that defendant (1) drove while his mental and physical faculties were substantially impaired by the consumption of alcohol, or (2) drove after he had consumed sufficient alcohol that he "had an alcohol concentration of 0.08 or more grams of alcohol per 210 liters of breath." Regarding the latter option of proving impairment, the jury was further instructed that "[t]he results of a chemical analysis are deemed sufficient evidence to prove a person's alcohol concentration." In light of our holding above, the question is whether "there is a reasonable possibility that" the erroneous admission of evidence of defendant's BAC impacted the jury's verdict.

The arresting officer in this matter testified that running a stop sign is not, standing alone, evidence of impairment, and that he did not witness any other illegal or unsafe driving by defendant. Defendant was at all times during the traffic stop, arrest, and detention able to: respond almost immediately when DeGrave turned on the blue lights in his vehicle; pull off onto a less-traveled side street, which DeGrave

"appreciate[d]"; appear not disheveled; have already removed the keys from his vehicle's ignition and placed them on the dashboard, which DeGrave again "appreciated"; be "polite and cooperative"; understand and follow directions; engage in conversation; inform DeGrave that he had "blades" on his person and arrange with the officer to place them on the roof of the vehicle; place the blades on the roof without difficulty or fumbling; and maintain his balance.

However, when DeGrave conducted standardized field sobriety tests on defendant, he observed six out of six possible clues of impairment on the horizontal nystagmus gaze test, two out of eight clues of impairment on the walk-and-turn test, and two out of four clues of impairment on the one-leg-stand test. DeGrave testified that these results taken together suggested "a 91 percent case that" defendant was appreciably impaired. In light of this evidence and DeGrave's testimony about defendant's red glassy eyes, slurred speech, and strong odor of alcohol, we conclude that there is not a reasonable possibility that the jury would have returned a verdict of not guilty in the absence of the erroneously admitted chemical analysis evidence.

### III. Conclusion

The trial court in this matter should have excluded the State's chemical analysis evidence due to the analyst's failure to conduct a proper observation period after defendant removed gum from his mouth. Nevertheless, because defendant has failed to establish that he was prejudiced by the trial court's error, his conviction must be upheld. *See* N.C. Gen. Stat. § 15A-1443(a).

NO PREJUDICIAL ERROR.

Judge ARROWOOD concurs in result only.

Judge WOOD concurs by separate opinion.

No. COA23-338 – *State v. Forney*

WOOD, Judge, concurring in the result only.

Although I agree with the result reached by the majority, I would hold the trial court's admission of the breath chemical analysis results was not error. The majority holds the admission of the breath chemical analysis results was error but not prejudicial error.

As the majority recognizes, "[t]he primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent." *Burgess v. Your House of Raleigh, Inc.,* 326 N.C. 205, 209, 388 S.E.2d 134, 137 (1990) (citation omitted). Thus, "[t]he best indicia of that intent are the [plain] language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish." *Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citations omitted). However, "if the statutory language is clear and unambiguous, then the statutory analysis ends, and the court gives the words in the statute their plain and definite meaning." *State v. Lemus*, 273 N.C. App. 155, 159, 848 S.E.2d 239, 242 (2020) (cleaned up).

As discussed by the majority, the statutory and regulatory provisions in this case address the admissibility of breath tests results obtained by means of chemical analysis. N.C. Gen. Stat. § 20-139.1(b) provides in pertinent part:

> A chemical analysis of the breath . . . is admissible in any court . . . if it meets both of the following requirements:
>
> (1) It is performed in accordance with the rules of the Department of Health and Human Services.

(2) The person performing the analysis had . . . a current permit . . . to perform a test of the breath using the type of instrument employed."

N.C. Gen. Stat. § 20-139.1(b) (2021).

The pertinent DHHS regulations are found at 10A NCAC 41B.0322 and 10A NCAC 41B.0101(6) of the North Carolina Administrative Code. 10A NCAC 41B.0322 provides that when administering a test using the Intoximeter, such as the one used in the present case, a chemical analyst must "[e]nsure [that] observation period requirements have been met" before collecting two breath samples for analysis. In turn, 10A NCAC 41B.0101(6) defines "observation period" as:

> a period during which a chemical analyst observes the person or persons to be tested to determine that the person or persons has not ingested alcohol or other fluids, regurgitated, vomited, eaten, or smoked in the 15 minutes immediately prior to the collection of a breath specimen. The chemical analyst may observe while conducting the operational procedures in using a breath testing instrument. Dental devices or oral jewelry need not be removed[.]

10A NCAC 41B.0101(6).

Here, the DHHS regulations do not explicitly list chewing gum or having gum in one's mouth under 10A NCAC 41B.0101(6)'s definition of "observation period." After hearing the evidence presented during Defendant's motion *in limine*, the trial court determined the issue regarding adherence to the regulatory procedures during the observation period concerned whether the act of chewing gum constitutes eating. As the trial court noted, there is nothing in the Administrative Code which offers a

definition of "eaten" as the term is used in 10A NCAC 41B.0101(6). Therefore, this word "must be given [its] common and ordinary meaning." *Lemus*, 273 N.C. App. at 159, 848 S.E.2d at 242 (citation omitted).

Consequently, the trial court consulted a Merriam-Webster dictionary to determine that the definition of "eat" is "to take in through the mouth as food, ingest, chew and swallow in turn." Based upon the ordinary understanding of the word "eaten" in the context of the DHHS regulations, the trial court held that the officer complied with the regulatory requirements for the observation period. Applying the plain and unambiguous language of the statutory and regulatory provisions, the trial court determined no evidence was presented that anything had been eaten by Defendant during the fifteen minutes of Officer Merritt's observations.

Although "best practice" operating procedures might have prompted Officer Merritt to restart the observation period after having Defendant spit out the gum, this "best practice" is not controlling. Instead, the statutory and regulatory provisions control.

While the majority suggests we should depart from the plain language of the DHHS regulations to avoid "absurd results" in the future, it is this Court's role to "interpret statutes as they are written; we do not rewrite statutes to ensure they achieve what we believe is the legislative intent." *C Invs. 2, LLC v. Auger*, 277 N.C. App. 420, 422, 860 S.E.2d 295, 298 (2021), *aff'd*, 383 N.C. 1, 881 S.E.2d 270 (2022). Thus, if "our interpretation of the plain language of a statute yields unintended

3

results, the General Assembly can amend the statute to ensure it achieves the intent of the legislative branch of our government." *Id.* Because the trial court made its determination based on the plain reading of the statute and DHHS regulations, I would find no error. Therefore, I respectfully concur in the result only.