STATE v. ROBERT M. HEWITT AND PAUL ROBERT RASH.

(Filed 24 February, 1965.)

**1. Automobiles § 59—**

In order to warrant overruling motion to nonsuit in a manslaughter prosecution, the State's evidence must show that defendant driver was guilty of an intentional, wilful or wanton violation of a safety statute or an inadvertent violation of such statute accompanied by recklessness of probable consequences of a dangerous nature amounting to a thoughtless or heedless indifference to the safety and rights of others, and that such conduct proximately caused the injury and death.

**2. Automobiles § 39—**

The fact that a heavy passenger car travelled 360 feet after the collision before it stopped in a ditch on its left side of the road is not evidence that

it was being driven at excessive speed at the time of the impact when there is evidence tending to show that the driver was rendered unconscious by the collision and that the vehicle was travelling downhill.

**3. Automobiles § 72—**

Evidence that the driver had been drinking, without evidence that he was under the influence, of intoxicating beverages and without any evidence of faulty driving on his part, such as following an irregular course on the highway, is insufficient to show a violation of G.S. 20-138.

**4. Automobiles § 59—    Evidence held insufficient to be submitted to the jury on the issue of culpable negligence.**

The evidence tended to show that a vehicle driven by defendant collided head-on with another vehicle on the highway and that the driver of the other car died as a result of injuries received in the collision. There was no evidence that defendant was driving at an unlawful speed or any sufficient evidence that he was under the influence of intoxicants. The debris, tire marks and physical facts at the scene left in mere conjecture which vehicle was over the center line of the highway. *Held:* Defendant-driver's motion to nonsuit should have been allowed, and the evidence being insufficient to be submitted to the jury as to him, nonsuit should also have been entered as to the owner-occupant sought to be held as an aider and abetter.

APPEAL by defendants from *Froneberger, J.,* November 1964 Session of RUTHERFORD.

This is a criminal action in which defendants are indicted for the felony of manslaughter.

Plea: Not guilty. Verdict: Guilty. Judgment: Imprisonment, as to each defendant.

*Attorney General Bruton, Assistant Attorney General Brady, and Staff Attorney Hornthal for the State.*
*Jones & Jones for defendants.*

MOORE, J.   The sole assignment of error is the refusal of the court to grant defendants' motions for nonsuit.

Ernest Patterson died as a result of injuries suffered in a collision between an Oldsmobile, which he was driving, and a Cadillac driven by defendant Hewitt. Defendant Rash owned, and was riding in, the Cadillac at the time. The collision occurred shortly after midnight on 14 March 1964 in Rutherford County on U. S. Highway 221 about 1½ miles north of the State line and 400 to 500 feet south of Broad River Bridge. The highway is 20 feet wide and runs generally north and south. The Cadillac was going south, the Oldsmobile north; they collided at or near the center of the highway at a point where the highway curves slightly to the right for southbound traffic. The highway is straight for ½ mile north of the point of collision, and is downhill in

approaching the river bridge from the north. The maximum speed limit is 55 miles per hour.

State Highway Patrolman Joe Wilson arrived at the scene about 15 minutes after the collision. He observed the cars, the condition of the highway, and talked to defendants at the scene and later. The Oldsmobile was on the east shoulder of the highway, and the Cadillac was off the embankment to the east of the highway 360 feet south of the Oldsmobile. Both cars were inoperable, both were damaged on the left front and left side. The left front wheel of the Cadillac was bent back and so wedged that it could not turn. There was, at the point of impact, debris, including glass and dirt, all over the road. There was glass all over the road but most of the dirt was on the east side. There was a tire or skid mark, which started about 2 feet west of the center line of the highway and extended from the point of impact southwardly across the center line to the east edge of the hardsurface; there were marks from the edge of the hardsurface to the place where the Cadillac came to rest. There was a groove in the asphalt which started to the east of the center line at or near the point of impact and ran southwardly, parallel to the skid mark, 232 feet to the east edge of the hardsurface — this groove was apparently made by some metallic part of the Cadillac. It was impossible to tell which wheel made the skid mark. After the impact the Cadillac went straight ahead, did not follow the curve of the road to its right.

At the scene the patrolman observed that both defendants had the odor of beer on their breath, but he could not say whether they were under the influence of intoxicants. There was no odor of intoxicants in the Cadillac, but there was in the Oldsmobile. Patterson was dead. Defendant Hewitt was unconscious and was removed to a hospital, and the patrolman talked to him the next day; the patrolman talked to defendant Rash at the scene. Defendants told the patrolman that Rash took a drink of whiskey at his home at 6:30 P.M., went to Hewitt's home where they both had a drink of whiskey about 7:30, they left Forest City about 8:30 and between that hour and midnight visited 3 or 4 taverns south of the State line and had a beer at each place, about one beer each hour, they went to Womack's place at the State line about midnight but did not go in because they were told that the "South Carolina law" was there, they left but after they had travelled north for some distance they decided to turn around and go back, the collision occurred on the way back to the State line.

Defendants testified in their own behalf; their testimony corresponded generally with what they had told the patrolman. They testified to additional details as follows: They left Forest City to go to the race track (location not disclosed), but when they got there they found

that the races had been "called off." They decided to go to the State line. They drank three beers, one at each of three taverns. They were not under the influence of intoxicants. When they went to Womack's a fight was going on and they were told that officers had been called. They left, but later decided to go back and see how the fight came out. They saw two lights coming down the road meeting them, the lights were "criss-crossing." Rash interrupted a conversation to say, "Whitey (Hewitt), that car is going to hit us." The Cadillac was on its right side of the road when the collision took place. Hewitt was knocked unconscious and lost control. Rash asked persons who soon arrived at the scene to call an ambulance and a patrolman.

The only direct evidence as to speed is from defendant Hewitt who testified: "We were going at 55 or 60 miles per hour. When I saw the car, I applied my brakes, but I do not have an opinion as to how fast we were going at the time of the collision. We had slowed down some."

The inquiry is whether there is *prima facie* evidence (1) that defendant Hewitt was guilty of an intentional, wilful or wanton violation of a statute designed for the protection of human life and limb, or guilty of an inadvertent violation of such statute accompanied by recklessness or probable consequences of a dangerous nature amounting altogether to a thoughtless disregard of consequences or heedless indifference to the safety and rights of others, and (2) that such violation and conduct was the proximate cause of the injury and resulting death of deceased. *State v. Cope,* 204 N.C. 28, 167 S.E. 456. And if so, we inquire further whether there is sufficient evidence of aiding and abetting on the part of defendant Rash to take the case to the jury as against him. *State v. Kelly,* 243 N.C. 177, 90 S.E. 2d 241.

The only direct evidence as to the speed of the Cadillac is the testimony of defendant Hewitt that he was driving 55 to 60 miles per hour as he neared the point of the accident, he applied brakes when he saw the Oldsmobile approaching and "slowed down some" but did not know his exact speed at the time of the impact. The Cadillac came to rest 360 feet south of the point where the Oldsmobile stopped; apparently the Oldsmobile went only a short distance after the impact. These are circumstances to be considered on the question of speed. *State v. Ward,* 258 N.C. 330, 128 S.E. 2d 673. However, it is undisputed that defendant Hewitt was rendered unconscious by the collision and had no control of the movements of the Cadillac after the impact. There is no testimony on the part of the State as to whether the Cadillac was going uphill, downhill or on the level. Defendants' Exhibit 2, a photograph identified as a true representation of the scene, clearly indicates that it was on a definite downgrade. How far a heavy uncontrolled automobile, which is travelling approximately 55 miles per hour at the

time it collides with another vehicle, will go down a decline before running off an embankment and coming to a stop is pure speculation. Furthermore, there is no evidence of recklessness or wanton conduct on the part of defendant Hewitt at any time prior to the collision. On a charge of culpable negligence in the operation of a motor vehicle, resulting in death, conduct is not to be measured with precision instruments or weighed on golden scales. There must be definite evidence of reckless and wanton conduct.

It appears that the State relies principally on its contention that the Cadillac, at the time of the collision, was across the center of the highway in the Oldsmobile's lane of travel. The contention is based on pure conjecture. There was glass "all over the road" — on both sides of the center line. There was dirt and debris on both sides, but there was more dirt on the east side. There was a wide tire mark which commenced two feet west of the center line and veered gradually to the east and continued for more than 230 feet to the east edge of the hardsurface where the Cadillac went onto the shoulder. The patrolman could not say which wheel made the tire track. There were no brake marks left by either car leading to or going beyond the point of impact. If the brakes of the Cadillac were being applied after the impact, it is reasonable to suppose there would have been tire marks from the wheels on both sides of the vehicle; but this was not the case. The left front wheel of the Cadillac was bent back by the force of the impact and imbedded in the wrecked fender; it could not roll or turn. State's exhibit 2 is a photograph, identified as a true representation of the damaged Cadillac as it was at the scene before it had been moved. It indicates that the tire was still on the left front wheel. The most reasonable supposition is that this immobilized tire made the mark seen and described by the patrolman. The indications are that the other wheels were in alignment and would turn. If the supposition be true, the impact occurred on the west, the Cadillac's, side of the highway. On the other hand, there was a grove or scrape mark in the highway running parallel to the tire mark (the evidence does not disclose which side of the tire mark the groove was on or how close it was to the tire mark). This groove commenced on the east side of the center line (the distance from the center line does not appear, the photograph of the scene does not show the groove at all). It is possible that the impact occurred at the point of beginning of the groove. It is also possible that some metallic portion of the Cadillac made contact with the surface of the highway after the Cadillac became disengaged from the Oldsmobile and had veered to the left. All this discussion of possibilities shows only that the respective positions of the cars at the time of the impact is, on the record evidence, simply conjecture, speculation and guesswork. A ver-

dict based on conjecture cannot in justice and good conscience be permitted to stand.

Defendant Hewitt had a drink of whisky at 7:30 P.M. From 7:30 to midnight he had four beers, about one each hour. He testified that he was not under the influence of these beverages. There is no evidence on the part of the State that he was. The fact that a motorist has been drinking, when considered in connection with faulty driving such as following an irregular course on the highway or other conduct indicating an impairment of physical or mental faculties, is sufficient *prima facie* to show a violation of G.S. 20-138. *State v. Gurley,* 257 N.C. 270, 125 S.E. 2d 445. But the requisite additional circumstances do not appear in the case at bar.

We are of the opinion, and so hold, that defendants' motions for nonsuit should have been allowed. There being no case for the jury against defendant Hewitt, it follows that defendant Rash could not be guilty on the theory of aiding and abetting.

Compare *State v. Roop,* 255 N.C. 607, 122 S.E. 2d 363.

Reversed.