STATE OF NORTH CAROLINA v. CHARLA DEAN DAVIS

No. COA09-1537

(Filed 16 November 2010)

### 1. Evidence— expert testimony—blood alcohol concentration —odor analysis not sufficiently reliable method

The trial court erred by allowing the State's expert witness to give his opinion of defendant's blood alcohol concentration (BAC) at the time of the accident. The witness's odor analysis was not a sufficiently reliable method of proof, and there was a reasonable possibility that a different result would have been reached at trial absent this testimony for the charges of driving while impaired, reckless driving, second-degree murder, and assault with a deadly weapon inflicting serious injury. However, the error was not prejudicial to defendant on the charges of driving while license revoked (DWLR) and felony hit

STATE v. DAVIS

[208 N.C. App. 26 (2010)]

and run. DWLR was remanded for resentencing because it was consolidated with the reckless driving charge.

**2. Motor Vehicles— driving while impaired—reckless driving— second-degree murder—assault with deadly weapon inflicting serious injury—motion to dismiss—sufficiency of evidence—blood alcohol concentration—impairment**

The trial court did not err by denying defendant's motion to dismiss several of the charges against her including second-degree murder, assault with a deadly weapon inflicting serious injury, driving while impaired, and reckless driving. The State was required to prove either defendant's blood alcohol concentration (BAC) at a relevant time after driving or that defendant was impaired. The State expert's testimony that defendant's BAC was 0.18 was sufficient to survive a motion to dismiss these charges. However, as the admission of the witness's odor test testimony was prejudicial, defendant was granted a new trial.

**3. Evidence— prior crimes or bad acts—DWI convictions— temporal remoteness**

The trial court committed prejudicial error by admitting defendant's 1989 and 1990 convictions for driving while impaired (DWI). In light of the sixteen-year gap between her older convictions and her more recent one, defendant's eighteen and nineteen-year-old convictions, combined with her sole conviction for DWI occurring in 2006, did not constitute part of a clear and consistent pattern of criminality.

**4. Homicide— second-degree murder—instruction—intent**

The trial court did not err or commit plain error by its instruction to the jury concerning the definition of intent in regard to the charge of second-degree murder. The trial court gave the pattern jury instruction three times, followed the third instruction with the definition of the word "intent" applied within the context of the instruction, repeated the instruction on malice, and then explained the meaning of "intent."

**5. Sentencing— aggravating factors—knowingly created great risk of death to more than one person with hazardous device or weapon**

The trial court did not err by submitting the aggravating factor to the jury that defendant knowingly created a great risk of

death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person even though defendant was already charged with assault with a deadly weapon inflicting serious injury (AWDWISI). AWD-WISI only required that a defendant use a deadly weapon and did not require the proof necessary for the aggravating factor.

Appeal by Defendant from judgments entered 11 June 2009 by Judge Richard D. Boner in Superior Court, Gaston County. Heard in the Court of Appeals 28 April 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

*James N. Freeman, Jr. for Defendant-Appellant.*

McGEE, Judge.

Charla Dean Davis (Defendant) was convicted of reckless driving, driving while license revoked, second-degree murder, two counts of felony hit and run, two counts of assault with a deadly weapon inflicting serious injury, and driving while impaired. Defendant appeals.

The evidence at trial tended to show that, at approximately 9:30 p.m. on 7 August 2008, Betty Adams (Ms. Adams) and six of her friends left Gastonia for Charlotte in a Ford Expedition (the Expedition). Ms. Adams' cousin, Kevin Adams (the driver), was driving the Expedition. As the driver drove east across the Catawba River Bridge (the bridge) on Wilkinson Boulevard, he suffered an aneurysm, his head "leaned over towards" Ms. Adams, and he became unable to drive the Expedition. Ms. Adams was in the front passenger seat, and she was able to use the brakes to stop the Expedition. Lawanna Pearson (Ms. Pearson) was seated behind Ms. Adams, and she grabbed the steering wheel. Ms. Adams and Ms. Pearson were thereby able to stop the Expedition in the middle of the bridge.

A tractor-trailer driven by Ronnie Eudy (Mr. Eudy) stopped behind the Expedition. Mr. Eudy got out of his tractor-trailer, approached the Expedition, and spoke with Ms. Adams. Ms. Adams told Mr. Eudy that the driver had suffered a stroke and Mr. Eudy offered his assistance. Ms. Adams, Ms. Pearson, and another passenger in the Expedition, Jerry Leach (Mr. Leach), continued speaking with Mr. Eudy while standing next to the driver's door of the Expedition. During their conversation, a "grey truck came speeding"

across the bridge in one of the westbound lanes. The grey truck struck Mr. Eudy, Ms. Adams, Ms. Pearson, and Mr. Leach. Ms. Adams, Ms. Pearson, and Mr. Leach each suffered injuries but survived; however, as a result of his injuries, Mr. Eudy died upon arrival at Carolinas Medical Center. The grey truck continued on after the accident, leaving the scene.

Richard Tashiro (Mr. Tashiro) testified he was driving his red pickup truck in one of the westbound lanes of the bridge. Mr. Tashiro said that he "saw two vehicles . . . approaching [him] and at the time [he] didn't know that they weren't moving. [He] could tell that it was probably a car and a truck[.]" Mr. Tashiro further testified that "as [he] got closer, [he] noticed a vehicle stopped in [his] lane on the right. . . . So [he] hit [his] brakes to stop and when [he] did [his] truck pulled to the right and hit the bridge and spun back around and [he] was facing back towards Charlotte[.]"

Belmont Police Sergeant Jason Davis (Sergeant Davis) investigated the accident scene and recovered pieces from a silver Saturn Vue (the Saturn). Sergeant Davis testified that a Saturn Vue was a "small SUV type vehicle." Sergeant Davis went to a nearby convenience store and spoke with the clerk on duty. The clerk informed Sergeant Davis that her co-worker, Bryant Burrell (Mr. Burrell), had received a phone call in which the caller told Mr. Burrell that the caller had hit someone with the caller's vehicle and intended to take the vehicle to Mr. Burrell's house. Sergeant Davis obtained Mr. Burrell's address in Mount Holly and accompanied officers of the Mount Holly Police Department to recover the vehicle.

The police officers found the Saturn at Mr. Burrell's house, with damage consistent with the accident on the bridge. The vehicle pieces recovered at the scene of the accident matched pieces missing from the Saturn. Mr. Burrell was home when Sergeant Davis and the officers arrived, and he told them that Defendant had called him while he was at work and said she was driving the Saturn. Mr. Burrell testified that Defendant also told him that "someone just crossed the yellow line and hit [her]." Mr. Burrell did not see Defendant that night, but he gave Belmont Police Sergeant Richard Spry (Sergeant Spry) Defendant's phone number and address. Sergeant Spry left voice messages on Defendant's phone and had Defendant's photograph published on the television during the next day's morning news. Mr. Burrell went with Sergeant Spry to Defendant's home address, but Defendant was not there.

Sergeant Spry first saw Defendant about 8:00 a.m. the following day, 8 August 2008. Defendant approached Sergeant Spry in the lobby of the Belmont Police Department and stated that she was aware the police were interested in speaking with her. Sergeant Spry described Defendant's clothing as being in disarray, "like it would have been if someone had slept in their clothes all night long." Sergeant Spry testified that he "could smell alcohol on [Defendant's] breath at that point."

Sergeant Spry then questioned Defendant, who stated she had been driving a silver Saturn Vue on the bridge the night of the accident and had hit something, but that she did not stop "because [she had] one more class. . . . A driving class." Sergeant Spry testified that he later learned the class Defendant was referring to was "an alcohol drinking class, assessment class" that Defendant was taking in order to "get her license back." In response to Sergeant Spry's further questioning, Defendant stated she went to the home of a friend, Laura Maynard (Ms. Maynard), and spent the night there. Defendant further stated that, after she arrived at Ms. Maynard's house, Ms. Maynard "gave [Defendant] some vodka." Sergeant Spry did not administer any blood or breath test to determine Defendant's blood alcohol on the morning of 8 August 2008. However, four days later, on 12 August 2008, Sergeant Spry asked Defendant to return to the Police Department and to undergo a blood test. The results of this blood test were negative for any drugs or alcohol.

Defendant was indicted and found guilty of the following: second-degree murder in the death of Mr. Eudy; two counts of assault with a deadly weapon inflicting serious injury (AWDWISI), for injury to Ms. Adams and to Mr. Leach; driving while impaired (DWI); felony hit and run in the death of Mr. Eudy; felony hit and run with personal injury to Ms. Adams; reckless driving; and driving while her driver's license was revoked (DWLR). The jury also found the following aggravating factor: "Defendant knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person."

The trial court sentenced Defendant to 276 months to 341 months in prison for second-degree murder; a consolidated sentence of 42 months to 60 months in prison for AWDWISI, to run consecutively with Defendant's sentence for second-degree murder; a consolidated sentence of 10 months to 12 months for hit and run, to run consecutively with Defendant's sentence for AWDWISI; and a sentence of 120

**STATE v. DAVIS**

[208 N.C. App. 26 (2010)]

days in prison for DWLR and reckless driving, to run concurrently with Defendant's sentence for second-degree murder. The trial court arrested judgment on Defendant's DWI conviction. Defendant appeals. Further facts will be discussed as necessary.

## I. Blood Alcohol Concentration

### A. Odor Analysis

[1] Defendant argues that the trial court committed reversible error in allowing the State's expert witness to give his opinion of Defendant's blood alcohol concentration (BAC) at the time of the accident. Defendant contends that the expert's opinion was not based on a sufficiently reliable method of proof. We agree.

At trial, the State offered the testimony of Paul L. Glover (Mr. Glover), a research scientist and branch head for the Forensic Test for Alcohol, a part of the North Carolina Department of Health and Human Services [DHHS]. Mr. Glover testified that, based on retrograde extrapolation, he was able to determine Defendant's BAC at the time of the accident. Mr. Glover explained that retrograde extrapolation allows an analyst to determine BAC at a designated time based on a reported alcohol concentration and the amount of time that elapsed between the time the sample was taken and time of the event in question. Our Supreme Court has explained retrograde extrapolation as

> a mathematical analysis in which a known blood alcohol test result is used to determine what an individual's blood alcohol level would have been at a specified earlier time. The analysis determines the prior blood alcohol level on the bases of (1) the time elapsed between the occurrence of the specified earlier event (*e.g.*, a vehicle crash) and the known blood test, and (2) the rate of elimination of alcohol from the subject's blood during the time between the event and the test.

*State v. Cook*, 362 N.C. 285, 288, 661 S.E.2d 874, 876 (2008). Our Courts have recognized retrograde extrapolation as a reliable method of proving BAC. *See State v. Davis*, 142 N.C. App. 81, 542 S.E.2d 236 (2001); *State v. Catoe*, 78 N.C. App. 167, 336 S.E.2d 691 (1985).

Defendant's challenge to Mr. Glover's testimony, however, focuses not on the retrograde extrapolation itself, but rather on the reported alcohol concentration upon which Mr. Glover based the extrapolation. When Defendant reported to the Belmont Police

Department on the morning of 8 August 2008, she was met by Sergeant Spry. Sergeant Spry did not perform any blood or breath tests on Defendant that morning. However, Sergeant Spry testified that he was able to smell alcohol on Defendant's breath that morning.

Mr. Glover based his retrograde extrapolation analysis on Sergeant Spry's report that Defendant's breath smelled of alcohol at 8:14 a.m. on 8 August 2008, more than ten hours after the accident. Mr. Glover testified during *voir dire* that the odor of alcohol did "not give [him] an absolute value with respect to the alcohol concentration, but it [did] show that alcohol was still in [Defendant's] system and [was] still being exhaled in her breath." Mr. Glover also testified during *voir dire* that the determination of BAC in this case was made under "the assumption that there was no alcohol consumption" by Defendant during the time between the accident and Defendant's meeting with Sergeant Spry. However, Mr. Glover opined that, based on "look[ing] at some papers, some texts, where the concentration of alcohol that is detectable by the human nose has been measured[,]" the lowest BAC that is detectable by odor alone is 0.02. Mr. Glover further testified that the literature he relied upon suggested a range of possible BAC levels, but that "[n]ot knowing the concentration, I used the lowest concentration that is detectable[.]" Over objection, Mr. Glover was permitted to testify that, in his opinion, at the time of the accident, Defendant had a BAC of 0.18.

Defendant contends that Mr. Glover's use of "odor analysis" as a baseline is an insufficient basis for the admission of his opinion. The test for the admissibility of expert testimony in North Carolina is set forth in *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 597 S.E.2d 674 (2004). *Howerton* affirms a three-part inquiry for determining the admissibility of expert testimony: "(1) Is the expert's proffered method of proof sufficiently reliable as an area for expert testimony? . . . (2) Is the witness testifying at trial qualified as an expert in that area of testimony? . . . [and] (3) Is the expert's testimony relevant?" *Id.* at 458, 597 S.E.2d at 686 (citations omitted). A trial court ruling on the admissibility of expert testimony is given " 'wide latitude of discretion[,]' " and will not be overturned absent an abuse of discretion. *Id.* (citation omitted). "An abuse of discretion results when 'the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Whaley*, 362 N.C. 156, 160, 655 S.E.2d 388, 390 (2008) (citation omitted).

At issue before us is whether Mr. Glover's odor analysis is a sufficiently reliable method of proof. In *Howerton*, the Supreme Court explained:

> Where . . . the trial court is without precedential guidance or faced with novel scientific theories, unestablished techniques, or compelling new perspectives on otherwise settled theories or techniques, a different approach is required. Here, the trial court should generally focus on the following nonexclusive "indices of reliability" to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable: "the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked 'to sacrifice its independence by accepting [the] scientific hypotheses on faith,' and independent research conducted by the expert."

*Howerton*, 358 N.C. at 460, 597 S.E.2d at 687 (citations omitted).

In *State v. Corriher*, 184 N.C. App. 168, 645 S.E.2d 413 (2007), the State relied on "retrograde extrapolation evidence . . . to explain that a blood sample exposed to heat over 12 days might register a lower blood alcohol concentration than it would have at the time it was drawn." *Id.* at 170, 645 S.E.2d at 415. The State's expert testified that he had previously performed a test on a sample of blood that was taken and then stored without refrigeration for seventy-eight days. *Id.* at 171, 645 S.E.2d at 415. Further, the expert testified that the study he performed was "conducted using accepted procedures and methodology and its results were published to the scientific community in newsletters and presented at scientific conferences." *Id.*

In the present case, Mr. Glover testified during *voir dire* that, though he had testified as an expert witness in North Carolina "[a]bout 230 to 240 times[,]" he had never before testified based solely on an odor analysis. Mr. Glover did mention one case in which he was involved that began with "people detect[ing] an odor[,]" but he said, "[u]ltimately [he] had a blood test on that one." Thus, the odor analysis at issue here is "[a] novel scientific theor[y], [an] unestablished technique[], or [a] compelling new perspective[] on otherwise settled theories or techniques" and must therefore be accompanied by sufficient indices of reliability. *Howerton*, 358 N.C. at 460, 597 S.E.2d at 687 (citations omitted).

Mr. Glover testified during voir dire that "there are published values for the concentrations of alcohol that humans . . . can detect with their nose." During his direct examination, Mr. Glover testified that he

looked at some papers, some texts, where the concentration of alcohol that is detectable by the human nose has been measured. We have a guide that deals with a lot of different chemicals and it will list the lowest value or lowest concentration that is detectable by the human nose. . . . I looked at that and found the lowest value that is detectable is 49 parts per million. If I convert that to a BAC for impaired driving type cases, that would be a .02.

However, Mr. Glover did not specify which texts provided him with this information, nor were such texts presented at trial. Likewise, there was no evidence that Mr. Glover had performed any independent verification of an odor analysis or "smell test" of this type, nor that he had ever submitted his methodology for peer review. Thus, the method of proof used by Mr. Glover in the case before us lacks the significant indices of reliability that we noted in *Corriher*.

Further, in N.C. Gen. Stat. § 20-139.1, the General Assembly has established a thorough set of "[p]rocedures governing chemical analyses[.]" N.C. Gen. Stat. § 20-139.1 (2009). N.C.G.S. § 20-139.1(a) provides that a chemical analysis of a person's BAC is admissible in implied-consent cases such as that at issue before us, and explicitly "does not limit the introduction of other competent evidence as to a person's alcohol concentration[.]" N.C.G.S. § 20-139.1(a). We note, however, that the rules governing the performance of a chemical analysis under N.C.G.S. § 20-139.1 are explicit in their requirements with respect to certain chemical analyses. For example, in order for the results of a breath analysis to be admissible, the analysis must be "performed in accordance with the rules of [DHHS]" as well as be performed by a person using an instrument for which a permit has been issued by DHHS. N.C.G.S. § 20-139.1(b)(1)-(2). Further, N.C.G.S. § 20-139.1(b2) provides that DHHS "shall perform preventative maintenance on breath-testing instruments used for chemical analysis." N.C.G.S. § 20-139.1(b2). Finally, N.C.G.S. § 20- 139.1(b3) requires "the testing of at least duplicate sequential breath samples." N.C.G.S. § 20-139.1(b3). "The results of the chemical analysis of all breath samples are admissible if the test results from any two consecutively collected breath samples do not differ from each other by an alcohol concentration greater than 0.02." *Id.* Chemical analyses of blood or urine samples are likewise regulated, requiring performance by an analyst possessing a DHHS permit "authorizing the chemical analyst to analyze blood or urine for alcohol or controlled substances, metabolites of a controlled substance, or any other impairing substance." N.C.G.S. § 20-139.1(c4).

The "odor analysis" performed in the case before us is lacking in any of the rigorous standards applied to chemical analyses of breath, blood and urine under N.C.G.S. § 20-139.1. Sergeant Spry reported that he smelled alcohol on Defendant's breath the day after the accident. Sergeant Spry made no attempt to test Defendant's BAC by breathalyzer or blood test. Mr. Glover's calculation of baseline BAC was based on "the odor of alcohol . . . detected on [Defendant's] breath" taken by Sergeant Spry at 8:00 a.m. on 8 August 2008, more than ten hours following the accident. There was no testimony showing how Sergeant Spry's alcohol-detecting abilities were even remotely comparable to those of a trained operator using well-maintained and certified equipment pursuant to a DHHS-issued permit. Based on the foregoing, we find that Mr. Glover's retrograde extrapolation was not supported by a reliable method of proof. In light of our review of accepted analysis methodologies, the odor analysis in the case before us was so unreliable that the trial court's decision was manifestly unsupported by reason. Therefore, the trial court abused its discretion in admitting this testimony.

## B. Prejudice

Defendant contends she is entitled to a new trial as a result of the trial court's error in admitting Mr. Glover's odor analysis testimony. "The erroneous admission of evidence requires a new trial only when the error is prejudicial." *State v. Chavis*, 141 N.C. App. 553, 566, 540 S.E.2d 404, 414 (2000) (citations omitted). "To show prejudicial error, a defendant has the burden of showing that 'there was a reasonable possibility that a different result would have been reached at trial if such error had not occurred.'" *Id.* (citations omitted). We therefore determine whether " 'there was a reasonable possibility that a different result would have been reached at trial' " had the trial court not admitted Mr. Glover's testimony regarding Defendant's BAC. *Id.* (citations omitted).

Other than Mr. Glover's testimony, the State presented no evidence as to Defendant's BAC. The trial court's instructions to the jury regarding DWI and second-degree murder specifically required that the jury determine whether Defendant had a BAC greater than 0.08 at any relevant time after driving. Because the State offered no other evidence of Defendant's BAC at the relevant time, there is a " 'reasonable possibility that a different result would have been reached at trial' " had the trial court not admitted Mr. Glover's testimony. *Id.* (citations omitted).

STATE v. DAVIS

[208 N.C. App. 26 (2010)]

C. Impairment

The State contends that evidence of impairment alone would support the convictions of second-degree murder and DWI. As the trial court's instructions were limited to BAC with respect to the charge of second-degree murder and for DWI, we disagree. However, the trial court's instruction on reckless driving required the jury to make the following determination:

> Second, that [Defendant] drove that vehicle while impaired and that in doing so she acted carelessly and heedlessly in willful or wanton disregard of the rights or safety of others.

> If you find from the evidence beyond a reasonable doubt that on or about the alleged date the defendant drove a vehicle upon a highway while impaired and that in so doing she acted carelessly or heedlessly in willful or wanton disregard of the rights or safety of others, then it would be your duty to return a verdict of guilty of reckless driving.

Thus, the jury was required to determine whether Defendant drove while impaired. The trial court instructed the jury that, to find Defendant guilty of AWDWISI, it must find as follows:

> First that the defendant assaulted Betty Adams by intentionally striking her with a motor vehicle. An assault is also sometimes referred to as a battery. An assault or battery is the intentional application of any force, directly or indirectly, to the person of another without his or her consent.

> Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom. Intent may be implied from culpable negligence if an injury is the direct result of intentional acts done under circumstances which show a reckless disregard for the safety of others and a willingness to inflict injury.

> The second thing the State must prove beyond a reasonable doubt is that the defendant used a deadly weapon. A deadly weapon is a weapon which is likely to cause death or serious bodily injury. A motor vehicle is a deadly weapon.

And, third, the State must prove that the defendant inflicted serious injury upon Betty Adams. Serious injury is defined as such physical injury as causes great pain and suffering.

The record shows that the only evidence the State offered of culpable negligence was Defendant's alleged impairment. Thus, the instructions to the jury regarding reckless driving and AWDWISI allowed the jury to find Defendant guilty of those charges based on a finding that Defendant was impaired and the instructions did not limit the jury solely to consideration of whether Defendant's BAC was 0.08 or greater. We therefore address the State's argument regarding the sufficiency of the evidence of impairment.

The State argues that our Supreme Court's decision in *State v. Hewitt*, 263 N.C. 759, 140 S.E.2d 241 (1965), is controlling as to this issue. The State quotes the following rule as set forth in *Hewitt*: "The fact that a motorist has been drinking, when considered in connection with faulty driving such as following an irregular course on the highway or other conduct indicating an impairment of physical or mental faculties, is sufficient *prima facie* to show [impairment]." *Id.* at 764, 140 S.E.2d at 244. In *Hewitt*, the defendant had been driving a vehicle that collided with another vehicle, causing the death of the other driver. *Id.* at 760, 140 S.E.2d at 241. The defendant had consumed approximately one alcoholic drink each hour during the five hours preceding the accident, but testified that he was not under the influence of alcohol while he was driving. *Id.* at 764, 140 S.E.2d at 244. The evidence presented by the State concerning the cause of the accident was described by the Court as "simply conjecture, speculation and guesswork," and the sole description of the defendant's driving was the defendant's own assertion that he had been driving at, or just above, the posted speed limit before the accident. *Id.* at 762-64, 140 S.E.2d at 243-44. In *Hewitt*, the Court held that, while there was evidence that the defendant had been drinking, the evidence was insufficient to establish a *prima facie* showing of a violation of N.C.G.S. § 20-138 because "the requisite additional circumstances [indicative of faulty driving] [did] not appear." *Id.* at 764, 140 S.E.2d at 244.

In the case before us, the State presented the testimony of two bartenders who served Defendant on 7 August 2008. Over the period of time between 5:00 p.m. and 9:20 p.m., Defendant was served four Pabst Blue Ribbon beers and two liquor drinks containing Wild Turkey 101. Defendant did not drink at least half of one of the beers. Neither bartender testified that Defendant was impaired that evening.

Thus, although there was testimony that Defendant had consumed alcohol prior to driving, there was no testimony that she was impaired.

> The correct test . . . is not whether the party . . . had drunk or consumed a spoonful or a quart of intoxicating beverage, but whether a person is under the influence of an intoxicating liquor . . . by reason of his having drunk a sufficient quantity of an intoxicating beverage . . . to cause him to lose normal control of his bodily or mental faculties, or both, to such an extent that there is an appreciable impairment of either or both of these faculties.

*State v. Ellis*, 261 N.C. 606, 607, 135 S.E.2d 584, 585 (1964).

The evidence concerning the circumstances of the accident included the following: Ms. Pearson testified that she, Mr. Eudy, Ms. Adams and Mr. Leach, were standing on the bridge next to the Expedition trying to avoid being hit by oncoming traffic. Sergeant Spry testified that "there were people across the center line that [Defendant] hit[.]" The door to Mr. Eudy's tractor-trailer was open and extended into Defendant's lane. Mr. Burrell told Sergeant Davis that Defendant had told him after the accident that someone had crossed into her lane and hit her, and that she had driven off. There was no other testimony regarding the manner in which Defendant was driving. As in *Hewitt*, the facts before us establish that Defendant had been drinking, but not that she was impaired. Further, Sergeant Spry testified as follows on cross-examination:

> Q. When you spoke to [Defendant] the morning after this happened, she did not conceal or hide the fact that she was involved in some kind of wreck on the bridge, did she?

> A. No, sir, she did not.

> Q. She didn't indicate she knew exactly what happened, did she?

> A. No, sir.

> Q. She indicated to you that she thought something came across the center line and hit her?

> A. That is correct.

> Q. Based on your investigation of the wreck, would that not be consistent with what happened?

> A. Are you asking me did something hit her?

Q. Okay. I am asking was something across the center line that got hit?

A. There were people across the center line that she hit, yes, sir.

Q. And you saw the Expedition on the bridge that night, correct?

A. Yes, sir.

Q. You saw how it was parked right there at the front left tire literally covering the double yellow line on the bridge; is that correct?

A. That is correct, yes, sir. It is on the double yellow line.

Q. And the passenger door—or the driver's side door of the Expedition was open by all accounts; is that correct?

A. Yes, sir.

Q. So it would have been extending even further into the oncoming lane of traffic. Is that not correct, sir?

A. That is correct, yes, sir.

Q. This isn't a big bridge, is it?

A. It's quite a small bridge, actually.

Q. Not a lot of margin for error on this bridge. Is that fair to say?

A. That's correct.

Q. There [are] four lanes but they are all narrow?

A. Yes, sir.

We do not find that Sergeant Spry's testimony that Defendant collided with someone or something that was extending into her lane of travel is tantamount to evidence of "faulty driving such as following an irregular course on the highway or other conduct indicating an impairment of physical or mental faculties," as determined in *Hewitt*. *Hewitt*, 263 N.C. at 764, 140 S.E.2d at 244. Thus, except for the fact of the collision itself, the State presented no evidence that Defendant's driving was in any way irregular or faulty. On this evidence, as in *Hewitt*, we find no *prima facie* showing of a violation of N.C.G.S. § 20-138, or of Defendant's impairment.

Because there was no evidence of impairment, the State was limited to proving reckless driving and AWDWISI by showing Defendant's BAC. Thus, there is a " 'reasonable possibility that a dif-

ferent result would have been reached at trial' " had the trial court not admitted Mr. Glover's odor test testimony. *Chavis*, 141 N.C. App. at 566, 540 S.E.2d at 414 (citations omitted).

We next address the charges of DWLR and felony hit and run. To sustain a conviction of DWLR, the State must prove that a defendant was driving a motor vehicle on a "highway[] of the State" while his or her driver's license was revoked. N.C. Gen. Stat. § 20-28 (2009) ("any person whose drivers license has been revoked who drives any motor vehicle upon the highways of the State while the license is revoked is guilty of a Class 1 misdemeanor"). N.C. Gen. Stat. § 20-166 sets forth the requirements for a conviction of felony hit and run as follows:

(a) The driver of any vehicle who knows or reasonably should know:

(1) That the vehicle which he or she is operating is involved in a crash; and

(2) That the crash has resulted in serious bodily injury, as defined in G.S. 14-32.4, or death to any person;

shall immediately stop his or her vehicle at the scene of the crash. The driver shall remain with the vehicle at the scene of the crash until a law-enforcement officer completes the investigation of the crash or authorizes the driver to leave and the vehicle to be removed, unless remaining at the scene places the driver or others at significant risk of injury.

Prior to the completion of the investigation of the crash by a law enforcement officer, or the consent of the officer to leave, the driver may not facilitate, allow, or agree to the removal of the vehicle from the scene for any purpose other than to call for a law enforcement officer, to call for medical assistance or medical treatment as set forth in subsection (b) of this section, or to remove oneself or others from significant risk of injury. If the driver does leave for a reason permitted by this subsection, then the driver must return with the vehicle to the accident scene within a reasonable period of time, unless otherwise instructed by a law enforcement officer. A willful violation of this subsection shall be punished as a Class F felony.

N.C. Gen. Stat. § 20-166 (2009). Thus, the elements of proof of DWLR and felony hit and run do not require a showing of impairment of a defendant or a defendant's BAC for conviction. Therefore, there is

not a " 'reasonable possibility that a different result would have been reached at trial' " on those charges had the trial court not admitted Mr. Glover's odor test testimony. *Chavis*, 141 N.C. App. at 566, 540 S.E.2d at 414 (citations omitted).

Therefore, for the charges of DWI, reckless driving, second-degree murder, and AWDWISI, the trial court's error in allowing Mr. Glover's odor test testimony was prejudicial to Defendant and Defendant is entitled to a new trial on those charges. The error was not prejudicial to Defendant as to the charges of DWLR and felony hit and run.

## II. Motion to Dismiss

**[2]** Defendant next argues that the trial court erred in denying her motion to dismiss several of the charges against her, because Mr. Glover's odor test testimony was inadmissible and the State presented no other evidence of Defendant's impairment. She contends the following charges should have been dismissed: second-degree murder; AWDWISI; DWI; and reckless driving. In light of our standard of review and our Court's holding in *State v. Morton*, 166 N.C. App. 477, 601 S.E.2d 873 (2004), we disagree.

A motion to dismiss criminal charges should be allowed only where the State has failed to show " 'substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of [the] defendant's being the perpetrator of the offense.' " *Id.* at 481, 601 S.E.2d at 876 (citation omitted). "All evidence actually admitted, whether competent or not, must be viewed in the light most favorable to the State, drawing every reasonable inference in favor of the State." *Id.* (citing *State v. Benson*, 331 N.C. 537, 544, 417 S.E.2d 756, 761 (1992) *and State v. Jones*, 342 N.C. 523, 540, 467 S.E.2d 12, 23 (1996)). "It is not a sufficient basis for granting a motion to dismiss that some of the evidence was erroneously admitted by the trial court." *Morton*, 166 N.C. App. at 481-82, 601 S.E.2d at 876.

In *Morton*, our Court reviewed a trial court's ruling on a defendant's motion to dismiss a charge of possession of stolen goods where the only evidence of the defendant's knowledge that the goods were stolen was improperly admitted by the trial court. *Id.* We described the defendant's argument thus:

Defendant contends there was insufficient evidence presented of the knowledge element of the crime, as the only evidence produced by the State indicating that defendant knew the items were

stolen came from [another suspect's] statements, read by [a] Detective . . . . Although such statements were improperly admitted by the trial court, they must be considered when reviewing the evidence on a motion to dismiss.

*Id.* at 482, 601 S.E.2d at 876. Our Court held that the trial court did not err in denying the defendant's motion despite the fact that the only evidence offered at trial as to an essential element of the charges should not have been admitted. In *Morton*, we reviewed the evidence actually presented at trial, including that which was inadmissible, and concluded that there was sufficient evidence to survive the motion to dismiss. *Id.* at 482, 601 S.E.2d 876-77. However, our Court held that the admission of the evidence was prejudicial error and granted a new trial. *Id.*, 601 S.E.2d at 877. Thus, for the purposes of determining whether a trial court has erred in ruling on a motion to dismiss, we put ourselves in the position of the trial court at the time of ruling on the motion, and do not take into consideration a later determination by our Court that certain evidence may have been admitted in error. Later determinations of admissibility are relevant, however, for a determination of whether a defendant was prejudiced.

In the present case, the State offered the inadmissible testimony of Mr. Glover regarding Defendant's BAC. Although the only evidence supporting a vital element of the charges challenged by Defendant's motion to dismiss was inadmissible, we must consider that evidence in our review of the trial court's denial of Defendant's motion. *See id.* As discussed above, in order to sustain convictions for DWI, second-degree murder, AWDWISI, and reckless driving, the State was required to prove either Defendant's BAC at a relevant time after driving, or that Defendant was impaired. Mr. Glover opined that Defendant's BAC was 0.18, which is sufficient evidence to survive a motion to dismiss as to these charges. Therefore, the trial court did not err in denying Defendant's motion to dismiss. However, as the admission of Mr. Glover's testimony was prejudicial, we must grant Defendant a new trial as set forth above.

### III. Defendant's Prior DWI Convictions

[3] Defendant next argues that the trial court erred in admitting her prior driving record and judgments which showed prior convictions for DWI to show malice on the part of Defendant regarding second-degree murder. Though we have granted Defendant a new trial as to her second-degree murder charge, this issue is likely to arise in her new trial and we therefore address it. The State offered evidence at

trial of Defendant's four prior DWI convictions. Defendant specifically challenges the introduction of three of the prior DWI convictions from 1989 and 1990, which occurred more than seventeen years prior to the accident giving rise to the present case. Defendant contends that the admission of the three convictions from 1989 and 1990 was prejudicial error, in that the convictions were too temporally remote to be admissible under N.C. Gen. Stat. § 8C-1, Rule 404(b). We agree.

N.C.Gen. Stat. § 8C-1, Rule 404(b) provides in pertinent part:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2009). Our Courts have held that "evidence of prior convictions is admissible under Rule 404(b) to show the malice necessary to support a second-degree murder conviction." *State v. Rich*, 132 N.C. App. 440, 450, 512 S.E.2d 441, 448 (1999), *aff'd* 351 N.C. 386, 527 S.E.2d 299 (2000). However, "[t]he admissibility of evidence under this rule is guided by two further constraints-similarity and temporal proximity." *State v. Lynch*, 334 N.C. 402, 412, 432 S.E.2d 349, 354 (1993).

Our Courts have recently addressed on several occasions the issue of temporal proximity with respect to the use of prior convictions to show malice. In *State v. Miller*, 142 N.C. App. 435, 440, 543 S.E.2d 201, 205 (2001), our Court rejected the defendant's argument that evidence of his convictions dating back sixteen years before the offense was too remote in time to be relevant. In *State v. Goodman*, 149 N.C. App. 57, 560 S.E.2d 196 (2002), *rev'd* 357 N.C. 43, 577 S.E.2d 619 (2003) (*per curiam*), our Court addressed the admission of a defendant's prior convictions occurring during the thirty-seven years before the date of the offense. In *Goodman*, our Court held that

[a]lthough we agree that the entire driving record should not have been admitted due to concerns of temporal proximity, to the extent three convictions for driving while intoxicated occurred only one and two years outside of the permissible time-frame set forth in *Miller*, the jury must assess the weight and credibility to afford that evidence.

*Id.* at 70, 560 S.E.2d at 204. In a dissenting opinion later adopted *per curiam* by our Supreme Court, Judge Greene wrote that "[a]lthough defendant has six prior driving while impaired convictions dating back to·1962, only one of those occurred in the sixteen years prior to the crime at issue and none within the eight years prior to the crime at issue." *Goodman,* 149 N.C. App. at 73, 560 S.E.2d at 206, (J. Greene, dissenting). Judge Greene wrote that he would have held the admission of the prior convictions was error and that this error was "of a fundamental nature and, in [his] opinion, had a 'probable impact on the jury's finding of guilt' and thus constitute[d] plain error." *Id.* (citation omitted). Judge Greene further stated: "Accordingly, I would grant defendant a new trial." *Id.*

In *State v. Maready,* 362 N.C. 614, 669 S.E.2d 564 (2008), our Supreme Court "reject[ed] the notion" that *Goodman* established a "bright-line rule" which prohibits the introduction of any convictions predating the offense by sixteen years. *Id.* at 624, 669 S.E.2d at 570. The Supreme Court wrote:

> The relevance of a temporally remote traffic-related conviction to the question of malice does not depend solely upon the amount of time that has passed since the conviction took place. Rather, the extent of its probative value depends largely on intervening circumstances. In the instant case, in which defendant was convicted of DWI four times in the sixteen years preceding the events now at issue, his older convictions do not serve only "to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." Those convictions instead constitute part of a clear and consistent pattern of criminality that is highly probative of his mental state at the time of his actions at issue here.

*Id.* (citations omitted). The Court further wrote:

> Unlike the instant case, *State v. Goodman* was an exception to the general rule: a case in which the intervening circumstances between temporally distant convictions and the actions at issue militated strongly against admission of the remote convictions. Our holding in *Goodman* was based on the temporal remoteness of the defendant's prior convictions *combined with* the defendant's relatively clean driving record in the years leading up to the crime at issue in that case. It does not follow that admission of any conviction greater than sixteen years old automatically constitutes error, and hence we disavow any such reading of *Goodman.*

*Id.* at 624-25, 669 S.E.2d at 570-71 (emphasis in the original). The Supreme Court ultimately found no plain error in the trial court's admission of the defendant's prior convictions predating the offense by more than sixteen years. *Id.* at 624, 669 S.E.2d at 570. In finding no plain error in the admission of the prior convictions in *Maready*, the Court conducted the following analysis distinguishing the facts of *Maready* from those in *Goodman*:

> Defendant's driving record in the instant case stands in stark contrast to the record at issue in *Goodman*. Like the *Goodman* defenant, defendant here had six previous DWI convictions. However, whereas only one of the *Goodman* defendant's previous DWI convictions occurred within the sixteen years preceding the crime at issue in that case, . . . defendant in the case *sub judice* was convicted of DWI four times in the sixteen years leading up to the incident at issue. Moreover, while the most recent prior DWI conviction in *Goodman* occurred more than eight years before the crime at issue there, . . . defendant in this case was convicted of DWI less than six months before the incident giving rise to the current charges against him.

*Id.* at 623, 669 S.E.2d at 570 (citations omitted).

In the case before us, Defendant was convicted of DWI four times prior to the 2008 offense. Three of those convictions occurred in 1989 and 1990, eighteen and nineteen years prior to the 2008 offense. The most recent of Defendant's prior DWI convictions occurred in 2006, two years prior to the 2008 offense. Thus, there was a gap of sixteen years between three of Defendant's prior convictions and her 2006 conviction. Defendant's case is strikingly similar to that of *Goodman*, in which "only one of the . . . defendant's previous DWI convictions occurred within the sixteen years preceding the crime at issue in that case[.]" *Id.* Likewise, Defendant's case is for the same reason distinguishable from *Maready*, where the defendant "was convicted of DWI four times in the sixteen years leading up to the incident at issue." *Id.*

In light of the sixteen-year gap between her older convictions and her more recent conviction, we find that Defendant's eighteen and nineteen-year-old convictions, combined with her sole conviction for DWI occurring in 2006, do not "constitute part of a clear and consistent pattern of criminality." *Id.* at 624, 669 S.E.2d at 570. Therefore, the older convictions are not "highly probative of [Defendant's] mental state at the time of [her] actions at issue here." *Id.* We therefore

hold that the admission of evidence concerning Defendant's 1989 and 1990 convictions for DWI was error; however, the admission of Defendant's DWI conviction from 2006 was not error because it was within the general time frame set forth in *Miller,* and affirmed by *Goodman* and *Maready.*

Defendant argues that the error occurring in the case before us was prejudicial. As stated above, "[t]o show prejudicial error, a defendant has the burden of showing that 'there was a reasonable possibility that a different result would have been reached at trial if such error had not occurred.'" *Chavis,* 141 N.C. App. at 566, 540 S.E.2d at 414 (citations omitted). In light of Judge Greene's dissenting opinion in *Goodman,* as adopted by our Supreme Court, we hold that the admission of Defendant's 1989 and 1990 convictions for DWI was prejudicial error. *See Goodman,* 149 N.C. App. at 73, 560 S.E.2d at 206, (J. Greene, dissenting).

IV. Jury Instructions

[4] Defendant further argues that the trial court committed plain error in its instructions to the jury concerning the definition of intent. Because Defendant did not object to the instructions at trial, Defendant requests that we review for plain error.

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to the appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings[.]"

*State v. Cummings,* 346 N.C. 291, 314, 488 S.E.2d 550, 563-64 (1997) (alteration in the original, citations omitted).

During its deliberation, the jury requested that the trial court again instruct the jury on second-degree murder. The trial court gave the instruction again, including the following malice instruction:

> Malice is a necessary element that distinguishes second degree murder from manslaughter. Malice arises when an act which is inherently dangerous to human life is intentionally done so reck-

lessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.

The jury later requested an instruction on "the definition of malice[.]" In response to that request, the trial court gave substantially the same instruction as above. The jury later sent a note to the trial court explaining that the jury was "having difficulty deciphering the definition of the word intent as it applies to malice[.]" The trial court made the following statement to counsel:

> [W]hat I intend—if, in fact, if they need a definition of the word intent, I will use the definition from Black's Law Dictionary which is this: "It is the exercise of intelligent will, the mind being fully aware of the nature and consequences of the act which is about to be done and with such knowledge and with full liberty and action willing and electing to do it."

After discussion with counsel, the trial court stated:

> I can take this somewhat convoluted definition, I think, and put it in plain English if that's what they are asking. It involves an exercise of will. A person intends an act when, aware of the nature and consequences of the act, that person chooses to do it. I think that is about as simple as I can make it.

The jury returned to the courtroom and the following exchange occurred:

> FOREMAN: We—on the charge of second degree murder, Judge, we just need clarification on the definition of malice and the word intent as the law states what it is so that we can be clear to understand how the evidence applies to those charges.
>
> THE COURT: Are you asking what the word intent means?
>
> FOREMAN: Yes, as the law defines it.
>
> THE COURT: Well, let me repeat the instruction and see if I can define intent for you. As I told you earlier, malice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard to human life and social duty and deliberately bent on mischief.
>
> So the instructions refer to an act that is inherently dangerous to human life that is intentionally done. The word intent, as it is used in the context of this instruction, means as follows: Intent

involves an exercise of will. A person intends an act when aware of the nature and consequences of the act that person chooses to do it. An act is intentional when a person makes a conscious decision or choice to do the act. That's as simple as I can make it. Does that answer your question?

FOREMAN: We appreciate it.

Defendant, quoting N.C. Pattern Jury Instruction 206.32, contends that this instruction "impermissibly takes the focus of the malice instruction off the proof necessary to show that an inherently dangerous act was 'intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.' " Defendant cites no authority in support of this argument, but contends that "[t]his de-emphasis of all the elements necessary to prove malice in a second degree murder case was a fundamental error."

We first note, in fact, that the trial court three times gave the jury the same instruction quoted above by Defendant. The third time the trial court gave the instruction, it followed with an explanation of how the definition of the word "intent" applied within the context of the instruction. When the jury requested a definition of the word "intent" alone, the trial court first repeated the instruction on malice and then explained the meaning of "intent." Viewing the instructions in context, and as a whole, we find no error, much less plain error.

## V. Aggravating Factor

[5] Defendant next argues that the trial court erred by submitting an aggravating factor to the jury. Specifically, Defendant argues that it was error to submit "aggravating factor number 8 to the jury as the conduct described in this aggravator was already the subject of the charges [Defendant] was tried and convicted on." Defendant assigns error to the aggravating factor that she "knowingly created a great risk of death to more than one person by means of a weapon or device which would normally be hazardous to the lives of more than one person." Defendant contends that, because the use of "a deadly weapon was an element of both the charges of assault with a deadly weapon inflicting serious injury[,] [t]his factor was improperly used to aggravate [her] sentence." We disagree.

N.C. Gen. Stat. § 15A-1340.16(d) provides, in pertinent part, that "[e]vidence necessary to prove an element of the offense shall not be used to prove any factor in aggravation." N.C. Gen. Stat.

§ 15A-1340.16(d) (2009). Defendant challenges specifically the following portion of the trial court's instruction to the jury regarding AWDWISI: "that . . . Defendant used a deadly weapon. A deadly weapon is a weapon likely to cause death or serious injury. A motor vehicle is a deadly weapon." Defendant contends that the evidence necessary to prove this element was used to prove the above-quoted aggravating factor. We note that AWDWISI requires simply that a defendant use a deadly weapon. The aggravating factor in the case before us required the jury to find that Defendant "created a great risk of death to more than one person by means' of a weapon or device which would normally be hazardous to the lives of more than one person." Because, for AWDWISI, the State was not required to prove that Defendant used a weapon or device which would normally be hazardous to the lives of more than one person, we find no error. *See State v. Crisp*, 126 N.C. App. 30, 40, 483 S.E.2d 462, 468 (1997) ("this Court has previously addressed this issue and held that it was not error to also find an aggravating factor from the use of a weapon after a defendant has been convicted of assault"); *and State v. Platt*, 85 N.C. App. 220, 228, 354 S.E.2d 332, 336 (1987) ("[I]n order to prove its case, the State simply needed to show that defendant used a deadly weapon, and it did not need to show, as an essential part of its proof of the charged offenses, that defendant employed a weapon normally hazardous to the lives of more than one person. . . . Accordingly, we hold the court did not err in finding this factor.").

## VI. Conclusion

The trial court erred by admitting evidence of Defendant's convictions for DWI from 1989 and 1990 to show malice. The trial court abused its discretion in admitting Mr. Glover's odor test testimony as to Defendant's BAC. These errors were prejudicial, and Defendant is entitled to a new trial as to those charges relying on Mr. Glover's testimony and Defendant's prior convictions as proof of the elements of the offenses. Because the trial court consolidated the charges of DWLR and reckless driving under the same file number for sentencing, and because we have granted a new trial on the reckless driving charge, we also remand for resentencing as to DWLR. *See State v. Wortham*, 318 N.C. 669, 674, 351 S.E.2d 294, 297 (1987).

No error in part, remanded for resentencing in part, and new trial in part, as follows:

No Error in 08-CRS-061770 and 08-CRS-061771.

Remanded for resentencing in 08-CRS-061772 for the offense of DWLR.

New Trial in 08-CRS-014067, 08-CRS-014068, 08-CRS-014069, and 08-CRS-014070, and in 08-CRS-061772 for the offense of reckless driving.

Judges STROUD and BEASLEY concur.